Douglas A. Donahue *vs.* Thomas F. Draper & others.[1]

Suffolk.   December 9, 1985. — April 9, 1986.

Present: Greaney, C.J., Kaplan, & Grant, JJ.

*Corporation,* Stockholder, Close corporation. *Fiduciary. Value. Good Will. Witness,* Expert. *Practice, Civil,* New trial. *Evidence,* Value.

At the trial of an action by a former officer and shareholder of a close corporation asserting claims arising from the plaintiff's being "frozen out" of the corporation, the judge correctly concluded that an economist called to testify for the plaintiff was qualified as an expert witness. [37]

An expert witness testifying as to the value of the goodwill of a close corporation could properly base his opinion on data which had not been gathered from the corporation's specific industry, and on sources which, in themselves, would be inadmissible as hearsay. [37-38].

At the trial of an action by a former officer and shareholder of a close corporation asserting claims which arose from the alleged "freeze-out" of the plaintiff by his business partner, the other principal of the corporation, the judge correctly declined to instruct the jury, as requested by the defense, to find, in effect, that the corporation had no goodwill if they found that its success depended mainly upon the defendant partner's personal skills. [38-39]

At the trial of an action by a former officer and shareholder of a close corporation asserting claims which arose from the alleged "freeze-out" of the plaintiff by his business partner, the other principal of the corporation, that portion of the judge's instructions to the jury respecting the valuation of the goodwill of the corporation in the event of its non-wrongful dissolution presented no issue on appeal, where the jury, in response to an interrogatory, had found that the defendant partner had acted wrongfully in appropriating the corporation's goodwill. [39-40]

At the trial of an action by a former officer and shareholder of a close corporation asserting claims which arose from the alleged "freeze-out" of the plaintiff by the other principal of the corporation, the judge correctly declined to instruct the jury, as requested by the defendant, that, in valuing the corporation's goodwill, they might consider the value of its shares

---

[1] Donahue-Draper Corporation, Thomas F. Draper Co., Inc., and Ethel M. Draper.

as expressed in a stock redemption agreement among the corporation and its two principals. [40-41]

In the circumstances of the trial of claims arising from the alleged "freeze-out" of the plaintiff, who had been one of two principals of a close corporation, the judge correctly instructed the jury that, in determining the value of the corporation's goodwill, they should ignore the fact that the corporation went into liquidation. [41]

In an action by a former corporate shareholder and officer alleging that he had been "frozen out" of a close corporation, which was thereafter liquidated, the plaintiff's recovery on claims of breach of fiduciary duty, arising from the distribution to him of the corporation's interest in its subsidiary in shares, rather than in cash, and the treatment of the plaintiff thereafter as a minority shareholder of the closely held subsidiary corporation, was set aside, and his claims were to be tried in a separate pending action in which the remaining shareholder of the subsidiary and the subsidiary itself had been joined as parties. [42-44]

On appeal in an action by a former officer and shareholder of a close corporation, alleging that he had been "frozen out" of the corporation, this court concluded that the evidence was insufficient, under the instructions given, to support the jury's award to the plaintiff of an amount intended to equalize his participation in the corporation's pension plan, and a new trial was ordered on the plaintiff's pension claim. [46-47]

CIVIL ACTION commenced in the Superior Court Department on July 20, 1978.

The case was tried before *Robert S. Prince, J.*

*Carl K. King (Peter S. Brooks* with him) for the defendants.

*Paul F. Ware, Jr. (Marie Lefton* with him) for the plaintiff.

KAPLAN, J. Douglas A. Donahue, an equal owner with Thomas F. Draper of Donahue-Draper Corporation (DDC), a "close" corporation,[2] sued Draper and others for damages for the commission of sundry breaches of fiduciary duties and breaches of contract associated with or consequent upon his being "frozen out" of the corporation.[3] The case was tried in much detail to a jury from November, 1981, to January, 1982.

---

[2] For definition or description of close corporation, see *Donahue* v. *Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 585-588 (1975). See also *Goode* v. *Ryan,* 397 Mass. 85, 86 (1986).

[3] For "freezeout," see *Donahue,* 367 Mass. at 588-592; *Wilkes* v. *Springside Nursing Home, Inc.,* 370 Mass. 842, 849-850 (1976).

The jury, responding to special interrogatories, returned answers prevailingly favorable to Donahue. Thereafter the trial judge made supplemental findings, and on June 28, 1983, an amended judgment entered, conforming to the answers and findings. The defendants appeal from parts of the judgment: Draper[4] now accepts that some of his actions were in breach of his duties toward Donahue, but he resists that conclusion as to other conduct.

In outline, the course of events, as the jury could have found it, was as follows. Until some time in 1967, Donahue through a sole proprietorship, Douglas A. Donahue Company (DAD), did business as a broker and dealer in scoured wools and noils;[5] Draper, through his wholly-owned corporation, Thomas F. Draper Co., Inc. (TFD), was engaged in the branch of the wool trade called top-making.[6] In 1967, the two discontinued their own enterprises and founded DDC, to be engaged chiefly in top-making. They contributed equal capital to the company, received equivalent amounts of its stock, and had an understanding between them of equal efforts, rights, and benefits. Draper became the operational, Donahue the financial partner, although there was some crossing over of functions.

By 1978, DDC had very greatly prospered. At that time, Draper was serving as president of DDC, and Donahue as treasurer, and the directors were Draper, Donahue, and Draper's

---

[4] References herein to "Draper," the main actor, sometimes actually include the other defendants without specific mention of the fact. We do not spell out the detail of the respective liabilities of Draper, DDC, and TFD under the judgment, as no question is raised about any allocations among them. Ethel's liabilities corresponded with her husband's since the jury found her to be in league with him (see answers to interrogatory 6 on "Conspiracy").

[5] Noils are short fibers removed during the combing of long fibers.

[6] "Top-making consists essentially of combining various types of raw ('grease') wool and having them processed into a finished quality ('top') wool which is then spun into yarn. The process consists of the initial combining and blending of various types and grades of grease wool in the proportions required to produce the finished top to conform to the particular specifications of the buyer. The grease wool blend is then cleaned ('scoured') and subjected to a carding process before being 'combed' into the final 'top' for sale to the buyer." (From statement of agreed facts.)

wife Ethel.[7] There was a falling out between the partners in April, 1978. Being able to count on Mrs. Draper's vote, Draper had at the time a practical control of DDC. Draper caused Donahue to be dismissed as treasurer of DDC; thereafter he removed Donahue as a trustee of the DDC pension trust, and as a director and officer of W.A. McNeill & Co., Inc. (McNeill Co.), a close corporation two-thirds owned by DDC. Draper cut Donahue's DDC annual salary (as an employee) to $25,000 while taking a salary of $65,000 for himself, and he took to himself other unequal emoluments. He proceeded toward the liquidation of DDC which was formally voted at a meeting of the directors and shareholders on September 20, 1979, with Donahue joining in the vote. During a preceding period, and thereafter during actual liquidation (completed in September, 1980), Draper so acted as to further his purpose of facilitating a transition or transfer of the top-making business from DDC to TFD. The latter company, reactivated on October 1, 1979, within a short time was dealing with former customers of DDC, occupying the old premises, using similar staff and the same telephone number, and so forth.[8]

To revert to the meeting of September 20, 1979, Donahue then stated that he was not agreeable to a distribution in kind of the stock of McNeill Co. held by DDC; he wanted cash. Thereafter Draper voted the DDC-owned shares of McNeill Co. (Wesley A. McNeill, the one-third owner of the company, joining) to replace Donahue by Ethel Draper as a director of McNeill Co. The directors acted to remove Donahue as an officer and, on behalf of McNeill Co., to waive any first refusal right in respect to the DDC-owned shares. Draper then caused those shares to be distributed to Donahue and himself in equal parts as a feature of the liquidation of DDC. From October, 1979, onward, Draper by agreement with Wesley McNeill received certain benefits from McNeill Co. in alleged breach

[7] At an earlier date the third director had been a relative of Donahue's. The change to Ethel Draper was a gesture of equalization, made quite casually.

[8] Donahue resumed business through DAD in the purchase and sale of scoured wools and noils and did not engage in any topmaking.

of his duty toward Donahue, now a minority shareholder of that company.

DDC made annual contributions to a DDC pension trust. Because Draper was eight years older than Donahue, DDC's contributions to the pension fund on Draper's account exceeded those on Donahue's behalf. In respect to any equalization of pension that was required between them upon the breakup of the company, a special complication arose because of a payment of $110,000 that Draper caused DDC to make to the pension trust on September 17, 1979 (for the trust's year 1979-80).

In consequence of the liquidation of DDC, Donahue received some $321,000, evidently as his share of the avails of the net tangible assets. In the present lawsuit, Donahue sought damages for —

*Salary and similar inequalities.* In response to the question whether in these connections Draper violated his "duty of utmost good faith and loyalty" to Donahue, failing to act "for a legitimate business purpose which could not be achieved through an alternative course of action less harmful" to Donahue,[9] the jury answered in Donahue's favor (interrogatory 1 on "Salary"), and some $71,000 was awarded (of which Donahue would recover one-half). This phase of the judgment has been satisfied.

*Pension equalization.* The jury made two relevant awards here. One, for $239,707 (answers to interrogatory 2 on "Pension"), has been satisfied. A second, for $110,000, of which Donahue would recover one-half (answers to interrogatories 5[iii][a] & [b] on "Use of Corporate Funds"), is on appeal.

*McNeill Co. affair.* The jury awarded Donahue $74,368 as damages (answers to interrogatory 3 on "W.A. McNeill & Co. Stock"). This is on appeal.

*Goodwill.* The jury found a corporate goodwill of $536,750 wrongfully appropriated by Draper (answers to interrogatory 4 on "Goodwill") of which Donahue would be entitled to one-half. This is on appeal.

---

[9] This formula, deriving from *Donahue,* 367 Mass. at 593, and *Wilkes,* 370 Mass. at 851-852, was used in framing other interrogatories as well.

1. *Goodwill.* The jury found that DDC had goodwill of the value mentioned as of the date just before April 12, 1978, the date of the quarrel (agreed by the parties to be the proper time for valuation); that Draper took this goodwill for his own use; and that TFD benefited from Draper's misappropriation. Draper argues on the present appeal that there was less or no goodwill to be taken.[10]

(a) Harold Petersen testified as an expert on Donahue's behalf and used a conventional method (and two alternatives) for ascertaining the existence of basic goodwill as well as its amount. We may take it that goodwill is, fundamentally, the value of an enterprise over and above the value of its net tangible assets, cf. *Kavanaugh* v. *Johnson,* 290 Mass. 587, 595 (1935), a value that may derive from the allegiance of customers, prolonged favorable relations with a source of financing, and the like.[11] In the case of an ordinary "public" corporation, one could (as of a relevant date) take the net earnings as they appeared, apply to this figure an appropriate multiple, and from the product subtract the value of the net tangible assets; any positive result would be an indication of the fact, and an idea of the extent, of the company's goodwill. In the case of a "close" corporation, earnings are typically withdrawn by the partners in the form of company-paid premiums for insurance on their lives, enhanced salaries, contributions to pensions, and perhaps various fringe benefits. Thus comes about a need for adjusting or "normalizing" earnings — ascertaining the "true" earnings — in working a formula for determining basic goodwill. See *Wilkes* v. *Springside Nursing Homes, Inc.,* 370 Mass. 842, 849-850 (1976); *Bessette* v.

---

[10] Draper took objections to evidence, to the judge's instructions on the matter of goodwill, and to the denial of motions for a directed verdict and for judgment n.o.v. or a new trial addressed to this among other subjects.

[11] Petersen spoke of "customer loyalty, . . . loyalty of employees, . . . association with suppliers, . . . association with a banker or financial institution, anything that tends to lead to continued patronage or continued availability of credit." See the varying expressions of the thought in *Moore* v. *Rawson,* 185 Mass. 264, 272-273 (1904); *Martin* v. *Jablonski,* 253 Mass. 451, 456-457 (1925); *Murray* v. *Bateman,* 315 Mass. 113, 115 (1943); *Lynn Tucker Sales, Inc.* v. *Leblanc,* 323 Mass. 721, 724 (1949); *Stefanski* v. *Gonnella,* 15 Mass. App. Ct. 500, 503 (1983).

*Bessette*, 385 Mass. 806, 809 (1982); *Hallahan* v. *Haltom Corp.*, 7 Mass. App. Ct. 68, 70 (1979); Herwitz, Business Planning 26-27 (1966). Petersen projected normalized net earnings for a year of $397,462; applied a multiplier of 6.4, which he believed appropriate for the kind of business; thus reached a product of $2,543,757; from which he subtracted net tangibles at the time of $968,608, yielding a basic goodwill of about $1,574,000. In the normalization process, Petersen allowed $70,800 for the combined annual salaries of the partners as a business expense of the company; the excess paid to the partners in the form of salary he considered as part of the company earnings. (The $70,800 amount, in particular, Draper criticized, as we note below.)

As to the alternative methods, Petersen offered one that dealt expressly with inflation, and another that projected earning power ahead for ten years. These estimates converged on the $1,574,000 for basic goodwill.[12] In the end, the jury allowed a goodwill of around one-third of that figure. On the basis of all that was put before them, the jury might have considered (with respect to Petersen's first method) that it would cost something more than $70,800 per year to acquire substitutes for Donahue and Draper; that the suggested multiplier was somewhat too high, etc.

---

[12] First: Take the normalized earning power of $397,462; adjust for inflation by deducting $79,366 (based on an inflation rate of 7%), yielding a remainder of $318,906; apply a multiple appropriate to this base, namely, 8.0, for a total of $2,544,768; deduct $968,608 of net tangible assets. Goodwill is $1,576,160.

Second: Earnings for ten years increasing at a 7% inflation rate amount to $4,739,166 (these are the earnings that could be withdrawn by the partners without impairing capital needed to continue to generate earnings). Discounted to the present at 16%, this comes to $2,111,712. Add $432,369, being the value of the net tangible assets as they would appear after ten years ($1,907,366), discounted to the present. The total is $2,544,081. Subtract $968,608 for the present value of the net tangible assets. Goodwill is $1,574,473.

The cases turn up some rather arbitrary formulas that have been used to fix the value of enterprises. See *White* v. *Universal Underwriters Ins. Co.*, 347 Mass. 367, 381-382 (1964); *Fisher* v. *Fisher*, 352 Mass. 592, 595-596 (1967); *Stefanski* v. *Gonnella*, 15 Mass. App. Ct. 500, 503-504 (1983). Compare the studied valuation of shares in *Piemonte* v. *New Boston Garden Corp.*, 377 Mass. 719 (1979).

(b) Draper contends that Petersen's testimony should have been struck or in any event that it was so weak as to infect the jury's findings of goodwill.[13]

There is no doubt that Petersen was properly held qualified to serve as an expert witness — a matter as to which the judge anyway had wide discretion. See *Commonwealth* v. *Dawn,* 302 Mass. 255, 258-259 (1939); *Arena* v. *John P. Squire Co.,* 321 Mass. 423, 425 (1947); *Keating* v. *Duxbury Housing Authy.,* 11 Mass. App. Ct. 934 (1981). It may be noted that Petersen had a doctoral degree in economics from Brown University, was an associate professor of economics at Boston College, and had served as chairman of the economics department there. He had a special interest in capital theory and finance. He had had some occasion to study the wool industry before being retained in the present case. He had studied the financial and other available data regarding DDC and read Draper's deposition testimony. He had referred to trade journals, economic surveys, and a variety of other published sources.

Draper attacked Petersen's analysis of basic goodwill at the point of his adjustment of partners' salaries, arguing that Petersen had no personal knowledge of the top-making business and had used surveys and other materials about executives' salaries and perquisites that did not include data gathered from this specific industry. The use, however, of data claimed to be "comparable" — such was Petersen's claim — was quite unobjectionable; for example, it is an everyday practice of experts testifying to the value of real estate. See *Lawrence* v. *O'Neill,* 317 Mass. 393, 397 (1944). Cf. *Piemonte* v. *New Boston Garden Corp.,* 377 Mass. 719, 727 (1979).[14] There

---

[13] Since the jury were not obliged to give weight to expert testimony on the part of Draper, but could rather have leaned to Petersen, Draper properly centered his attack on Petersen.

[14] Of course, the expert must start with an understanding of the facts about the thing being valued — here such facts appeared in the financial statements and other documents. Contrast *State Tax Commn.* v. *Assessors of Springfield,* 331 Mass. 677, 684-685 (1954); *LaClair* v. *Silberline Mfg. Co.,* 379 Mass. 21, 31-33 (1979); *Assessors of Andover* v. *Innes,* 396 Mass. 564, 565-566 (1986).

was also argument, it seemed, that Petersen's testimony, so far as it found a basis in trade journals, surveys, etc. was inadmissible hearsay. On the contrary, "[a]n expert may testify to value although his knowledge of details is chiefly derived from inadmissible sources, because he gives the sanction of his general experience. But the fact that an expert may use hearsay as a ground of opinion does not make the hearsay admissible." *National Bank of Commerce* v. *New Bedford,* 175 Mass. 257, 261 (1900) (Holmes, C.J.). See also *Whitney* v. *Thacher,* 117 Mass. 523, 527 (1875). The "details" from "inadmissible sources" are not tendered to establish their intrinsic truth, and hearsay in any proscribed sense is not involved.

(c) Draper contends that the judge committed errors which unfairly or improperly blunted his efforts to bring in factors that might discredit or diminish Petersen's estimate of basic goodwill. Draper says that the judge mistakenly refused to instruct the jury to "consider" his personal skills, abilities, and attributes, and that, had the judge so instructed, the jury might have found that "no goodwill or only a nominal amount" could be ascribed to DDC. The judge declined to adopt the instructions requested by Draper (Nos. 68-70), whose effect would have been more radical — to require the jury to find there was no DDC goodwill if the company's success was mainly dependent on this skill factor. That would not conform to the law. The existence and value of a goodwill upon one or another kind of dissolution of a partnership enterprise is a question of fact. See *Rutan* v. *Coolidge,* 241 Mass. 584, 597 (1922). As appears from *Stefanski* v. *Gonnella,* 15 Mass. App. Ct. 500, 501-503 (1983), reviewing the decisional history, goodwill has been found in professional partnerships (accountants, architects, dentists, etc.) where individual skill may be highly important, and when found, the goodwill is "an asset of the firm, and a partner appropriating it to his own use must account for its value." *Id.* at 502, quoting from *Whitman* v. *Jones,* 322 Mass. 340, 343 (1948). In the present case — an alleged calculated freezeout — the judge charged, without objection: "If you find that [DDC] had a goodwill value, I instruct you that such value belonged to the corporation, and not to the stock-

holders individually, and in the absence of an agreement to the contrary, the goodwill of the partnership is an asset of the firm, and a partner appropriating it to its [*sic*: "his"] own use must account for its value. This is true whether or not the goodwill is partly derived from experience and contacts which one partner had prior to forming a joint enterprise. In such a case he is deemed to have distributed [*sic*: "contributed"] the goodwill to the joint enterprise and may not reappropriate it for his own use without paying for its value." See *Moore* v. *Rawson,* 185 Mass. 264, 272 (1904); *Hutchins* v. *Page,* 204 Mass. 284, 290 (1910); *Costa* v. *Costa,* 222 Mass. 280, 282 (1915); *Murray* v. *Bateman,* 315 Mass. 113, 114 (1943); *Whitman* v. *Jones,* 322 Mass. 340, 343 (1948); *Fisher* v. *Fisher,* 349 Mass. 675, 678 (1965), 352 Mass. 592 (1967); *Lawson* v. *Shine,* 1 Mass. App. Ct. 814, 815 (1973). We add that DDC's business is misconceived if one imagines that it revolved about the singular delicate skill or experience of the blender: the evidence showed that, like many other mercantile establishments, the business dealt in a robust way with large quantities, lines of credit, and foreign currencies, and was not an esoteric endeavor responsive to one virtuosic hand.

(d) The judge properly instructed the jury that upon "termination" of DDC, each partner would have a right to enter a new business, or reestablish an old one, or solicit the former customers of DDC; the exercise of this right would not have encompassed a "takeover" of the company's goodwill. This instruction was a virtual paraphrase of an instruction requested by Draper (No. 71). It offered the picture of a company peacefully dissolved without agreement as to goodwill, where each partner might later carry on lawfully without restraint. It was left to the jury, by interrogatory 4(b), to find whether the picture was different here, whether Draper had "take[n] the goodwill of [DDC] for his own benefit," i.e., unlawfully appropriated it; and the jury answered, "Yes." The jury were helped toward a rational finding by considering, according to the instruction, the line between the permissible and impermissible.

Draper appears to be arguing that the judge should have instructed the jury to put a value on Draper's right to do business, in case of some innocuous dissolution, and deduct it from the value of the goodwill improperly taken by Draper (should the jury find that he misappropriated). It is unnecessary to go further than to say that Draper did not offer an instruction on that line, nor did he object on such a basis to any instruction that the judge gave, nor did he offer evidence that bore specifically on the figure to be deducted if his notion were accepted. In a larger sense, we are unable to see the logic of Draper's proposition. When one partner wrongfully takes to himself the goodwill of the enterprise, the other is entitled to his share of its value, and any values hypothesized as to events which did not occur can have little bearing.[15]

(e) Other matters. (i) Donahue, Draper, and DDC were parties to a stock redemption agreement by which (omitting details) in case of the death of a partner, DDC would purchase the partner's shares at a fixed value (using the proceeds of insurance carried on the partner's life), and, in case a partner proposed to transfer his shares to an outsider, would accord DDC a right of first refusal at the lower of the fixed value or the amount offered by the outsider. The value was to be fixed by agreement from time to time.

Draper requested an instruction that "[i]n determining whether . . . there was goodwill value in DDC, you are entitled to take into account whether [Donahue and Draper] considered there to be goodwill value in DDC in computing the various values of shares of DDC stock in amendments to the Corporate Stock Redemption Agreement over the years." The judge did not give this charge, but Draper appears not to have pointed to the omission and registered an objection as Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974), requires. In any event, the omission can hardly be thought serious. We are able to say that the

---

[15] As well might the jury be asked to speculate on the values involved in other events contrary to fact, e.g. a sale of the whole business to a third party where, to make the sale go, the partners might have to agree to covenants not to compete for some period of time, for which, however, they might exact a price.

value "including goodwill" on March 3, 1978 (near the critical date) was fixed by agreement at $695 a share. When $695 is multiplied by 2,500, the number of shares outstanding, yielding $1,737,500, and from this is subtracted $1,300,451, the then "book value" of DDC's tangible assets, what comes out is that there was a goodwill at a (superficial) figure of $437,049.

Draper seems to contend that the judge should have charged that $437,049 was the ceiling on what the jury could find as goodwill. Draper did not request this instruction, which anyway would be wrong for the reason — among others — that an agreed value for the particular redemption purpose may be the product of motives and considerations that are irrelevant to fixing value for our present purpose.

(ii) The judge charged, without objection, that in considering the question of goodwill the jury should disregard the fact that DDC went into liquidation. The jury found (answer to interrogatory 7) that "the breach of the working relationship between the partners" was by "mutual agreement." Liquidation became inevitable and Donahue's vote followed as a matter of course. Formal liquidation, however, does not insulate a partner from liability for the consequences of a wrongful plan to take and appropriate the goodwill of the company to his own use. The agreed date for determining goodwill was indeed just prior to April 12, 1978, well before the liquidation vote. The judge did not charge, as Draper requested, that "[g]oodwill relates to a business as a going concern and is not involved in a business in liquidation." This would have been misleading. The cases that speak of goodwill as related to a going concern[16] can mean merely that in measuring goodwill one may project the earning power of a company as if it were to continue as a going entity.

(iii) The court excluded a document "NN" for identification, offered by Draper, showing TFD's net income (among other things) for years ended February 28, 1981 and 1980. It was irrelevant or only minimally relevant in its bearing on the value in April, 1978, of the goodwill of DDC. Also offered by

---

[16] See *Slate Co.* v. *Bikash*, 343 Mass. 172, 175 (1961); *Johnson* v. *Kennedy*, 350 Mass. 294, 298 (1966).

Draper, and excluded, were documents "H" and "I" for iden-
tification showing DAD's transactions with former suppliers
and customers of DDC: Draper, however, is not claiming any
misappropriation of goodwill by Donahue.[17] The judge allowed
in evidence exhibit 37, consisting of a list of TFD's customers
during the period September 28, 1979, to November 26, 1980,
and pages of detail from which could be pieced out the gross
sales. Donahue's purpose was to demonstrate the overlap be-
tween TFD's customers and the former customers of DDC
including certain of the most important customers; this was
relevant to tracing the misappropriation. Draper claims that
attention to gross sales (especially without reference to net
income) could leave an erroneous impression with the jury. It
might have been better to trim the detail, but the jury were so
educated in the course of this lengthy trial that the error, if
any, must be seen as trivial.

2. *McNeill Co. shares.* Count IV of Donahue's amended
complaint alleged that Draper, instead of causing the DDC-
owned shares of McNeill Co. to be distributed in kind to
Donahue and himself, had a duty to vote those shares to liquid-
ate McNeill Co., so that Donahue might receive cash. Count
IV went on to allege that, following the distribution in kind,
Draper had received benefits from his association with McNeill
Co. (presumably with the help of Wesley McNeill) in the form
of consulting fees, financing by McNeill Co. of purchases by
TFD, and otherwise, while Donahue received no such benefits
and was left in a weak and profitless minority position in
McNeill Co.

The trial judge directed a verdict against Donahue on count
IV: the evidence, he held, was insufficient to establish that
distribution in kind, instead of liquidation in cash, was a breach
of duty toward Donahue.[18] He said the claims of later manipu-
lation of McNeill Co. by Draper and Wesley McNeill to provide

---

[17] See note 8, *supra.*

[18] The judge also ruled that the evidence was insufficient to prove that
Donahue was injured by receiving stock rather than "whatever cash distri-
bution" might have resulted from liquidating McNeill Co., and insufficient
"to warrant any reasonable determination of damages under Count IV."

unequal benefits to Draper could not be adjudicated in the absence of that company and Wesley McNeill as parties to the present action. The judge, however, let stand count V, which alleged that Draper's causing the distribution in kind was not properly authorized by vote of DDC's directors and injured Donahue by denying him cash and leaving him in a powerless minority position in McNeill Co. In response to interrogatories the jury were permitted to find that Draper was not authorized to make a distribution in kind, and violated a fiduciary duty toward Donahue by voting the DDC shares in McNeill Co. "in a manner injurious to Mr. Donahue" and "contrary to [his] express desire." Damages of $74,368 were found, evidently intended to represent the whole value of the shares of McNeill Co. distributed to Donahue, but without requiring him to surrender the shares. (See answers to interrogatories 3[a][i], [ii], 3[b], 3[c] on "W. A. McNeill & Co. Stock.")

That Draper wronged Donahue in various respects should not carry over to condemn him in all. The McNeill Co. transaction needs individual study. We think the judge's view of count IV was correct and the same fate should have befallen count V. The evidence did not show that, as a matter of business judgment, it would have been better for all the interests concerned to try to turn the McNeill Co. shares into money, rather than to make an equal distribution of the shares between the two partners. Equal treatment (even if it should turn out ill-advised) is not often the mark of a breach of fiduciary duty. Whether a liquidation of McNeill Co. — if that were the means to be employed to raise money — could be carried out in fairness to Wesley McNeill, was also unproved. The suggestion that Draper acted "without proper authorization" of DDC in distributing the shares raised at most a technical question, and one which the jury were strikingly ill-equipped to answer. Liquidation of DDC having been voted at the meeting of September 20, 1979, it would not be extravagant to say that the particular steps of the liquidation might be carried out by the principal officer of the corporation without going back to the

directors for repeated votes.[19] In any event, the composition of the board of directors at the time would have made any references back to them for ratification no more than a gesture.[20]

Donahue's real grievance attached not to his receiving the shares of McNeill Co.,[21] but rather to his being treated thereafter as a minority shareholder of that close corporation. On that issue, not only was the evidence slender, but it should not have been admitted at all without the joinder of Wesley McNeill and McNeill Co. as parties to the action. In fact there is now pending at issue, untried, in Superior Court, Suffolk County, an action (No. 47471) by Donahue against Draper, Wesley McNeill, and McNeill Co., in which the issues whether there was discriminatory management of McNeill Co. to the improper benefit of Draper and Wesley McNeill are set out for trial, and can be decided.[22]

3. *A $110,000 payment.* In 1970, DDC set up for its employees a pension trust on a "defined benefit" basis. This involved a commitment to pay each pensioner a percentage of his pay after retirement (actually the average of his compensation during his best five consecutive years of service). The terms of such a plan, including those on which the company undertakes to make annual contributions to the trust, can hardly fail to be complex.

The time of retirement and of commencement of benefits was established at age 65 or after ten years of participation in the plan, if later (but not beyond age 68). This meant that

---

[19] The by-laws of DDC named the president as "the principal executive officer" of the corporation, who, subject to the control of the directors, "shall in general supervise and control all of the business and affairs of the corporation."

[20] In *Hurley* v. *Ornsteen,* 311 Mass. 477, 480 (1942), bankruptcy intervened before formal ratification of informal action could take place. Cf. *Lucey* v. *Hero Intl. Corp.,* 361 Mass. 569 (1972); *Anderson* v. *K. G. Moore, Inc.,* 6 Mass. App. Ct. 386, 390 (1978).

[21] Cf. note 18, *supra,* about the practical consequences of this distribution.

[22] Fairness requires that the present action shall not be used as having any preclusive effect as former adjudication upon any issue in No. 47471, and we so declare. See Restatement (Second) of Judgments § 26(1)(b) (1982).

Draper would reach retirement in 1980, Donahue in 1987. The company's annual contributions to the trust on account of Draper were thus larger than those on Donahue's account. In line apparently, with the partners' understanding about equality of treatment, it was the practice, through October, 1976, for the company to make differential payments annually to Donahue, as supplements or additions to salary. Over these years, the payments aggregated $27,471. In the subsequent years this practice was abandoned on some understanding that what was Donahue's due for equalization would be left in the company, but be subject to his call. There is difficulty in describing with precision just what the understanding may have been; it was not reduced to writing between the partners and was to some extent inchoate.

With the breakup of DDC, a problem naturally arose about the partners' pensions (as noted, Donahue was ousted as a trustee of the pension trust). If, as the jury findings would indicate, Donahue had done nothing to forfeit any pension rights, there would have to be some kind of final adjustment between Draper and himself.

As of September 15, 1979, Donahue's retirement pension was assumed to be $9/17$ accrued, whereas Draper's was $9/10$ accrued. On September 17, 1979, just before the meeting at which liquidation was voted, Draper caused DDC to pay over to the pension trust a sum for 1979-80, of which about $110,000 may be taken as intended to comprise the funding of his pension; this on the footing of his still being an employee of DDC. (Whether this states accurately Draper's purpose is also open to some doubt.)

Kevin P. Martin, a certified public accountant who had long experience with DDC, presented to the partners, at a date not settled in the evidence, a method of working out an equalization. This analysis considered the problem from the "payments" side, i.e. payments by DDC into the trust. It showed an obligation to Donahue of $239,707. The document presenting the calculation was offered in evidence by Donahue and received over Draper's objections as exhibit 16. The amount mentioned evidently was seen as the measure of Donahue's recovery.

Charles D. Miller, an expert on pensions, testified at trial about the purchase of annuities by the trust as a means of equalizing, roughly, the partners' pension benefits. Donahue, in argument, claims that the jury followed Miller by recognizing the difference in the costs of the annuities, and that they then made certain adjustments, all separate from the September 17, 1979, payment. This might justify a recovery by Donahue of a figure approximating, but not matching, the $239,707, and would justify, in addition, a recovery of the $110,000 (half to pass to Donahue).

As recounted above, only the jury's award of the $110,000 is under appeal. The condition of the relevant record is unsatisfactory. The judge left it to the jury to decide what was the parties' understanding about equalization. He put interrogatories under the caption "Pension" about Draper's alleged withholding of accrued pension benefits from Donahue, and further interrogatories under "Use of Corporate Funds" about the 1979 pension contribution. There was no instruction dealing in any useful way with the relation between the two matters. An attempt to justify the $110,000 finding runs into the trouble that it looks incompatible with the award of precisely $239,707. Conceivably the jury left any question of duplication to be straightened out by the judge. In discussion with counsel just before the jury instructions, there was indeed a suggestion (although not a clear one) that the judge might perform such an operation, but ultimately he declined to do so, without explanation.

In all the circumstances, we think there is enough doubt whether the evidence supports the $110,000 finding to warrant granting Draper's motion for a new trial so far as it applies to this recovery.[23] If this intricate matter is to be further pursued,

---

[23] We note the following although it plays no part in our decision. As a supplement to his pending motion for a new trial (accompanying his motion for judgment n.o.v.), and as evidence said to be unavailable at trial, Draper in May, 1983, presented an affidavit by Charles D. Miller. This set out figures purporting to show that upon a windup of the pension trust there would be such an overfunding that an amount in excess of $110,000 would be returned to DDC. If Draper were now required to pay in $110,000, there would be duplication — so Draper claimed — on any theory.

one imagines that the parties will seek a better means to do it than trial by jury.

As to goodwill, the judgment is affirmed; as to the McNeill Co. shares, the judgment is reversed without prejudice to the maintenance of the pending Superior Court action, as indicated in this opinion; as to the $110,000 award, the judgment is reversed and the matter remanded for a new trial.

*So ordered.*