Town of Abington & another *vs.* Louis F. Cutter & others.

Plymouth.    May 5, 1942. — June 23, 1942.

Present: Field, C.J., Donahue, Qua, Dolan, & Cox, JJ.

*Water. Municipal Corporations,* Water supply. *Bog. Public Health.*

A town, which under statutory authority had taken the waters of a pond and its inlets for its water supply, was not entitled to maintain a suit to enjoin the flow of water into the pond from adjoining cranberry bogs as in violation of G. L. (Ter Ed.) c. 111, § 167, where findings by a master were that the bogs were operated in a clean and sanitary manner; that, while water as it entered the pond from the bogs was "unsuitable" for drinking purposes because of odor and taste due to organisms present in the water and of color due to contact with leaves and twigs, the evidence was insufficient to show that the continued discharge into the pond of water containing such organisms would in any way deteriorate the quality of the water in the pond or that the water was impaired by reason of its color.

Bill in equity, filed in the Superior Court on April 12, 1939.

The final decree was entered by order of *Hurley,* J.

*J. R. Wheatley,* for the plaintiffs.

*E. G. Townes,* for the defendants Cutter and others.

*W. M. Kerwin,* for the defendant Harding.

Cox, J.    This is a bill in equity by two towns to enjoin the defendants, who are the owners of cranberry bogs, from interfering with the natural flow of water into a pond that is a part of the plaintiffs' water supply, from allowing any water to flow into that pond that shall have become adversely affected by flowing through or standing in ditches in the cranberry bogs, and from discharging any waste, refuse or polluting matter that may in any way corrupt or impair the quality of the water in that pond or render it

injurious to health. The suit was referred to a master. The plaintiffs' exceptions were overruled, and the master's report was confirmed by interlocutory decree. The plaintiffs appealed from the final decree dismissing the bill.

The plaintiffs were authorized by St. 1885, c. 206, to take the waters of Great Sandy Bottom Pond, hereinafter referred to as the Great pond, in the town of Pembroke, and the waters that flow into and from the same, or any part thereof. Other powers contained in said c. 206 are not involved. Acting under this authority, the plaintiffs took possession under a deed of taking dated July 2, 1886, of the Great pond with its "inlets, outlets and shores" for the purposes set forth in said statute. The plan that was filed with the deed, and referred to therein, shows the Great pond, the parcel of land at its northerly end, which also was taken by the plaintiffs, and the "inlet" or a portion of it from Little Sandy Pond, hereinafter referred to as the Little pond. No part of the Little pond, which is to the south of the Great pond, is shown on the plan.

Between the two ponds are the cranberry bogs that are owned by the defendants. A portion of the bogs was acquired in 1886 by a deed that was made to correct an error in the execution of a former deed to the same premises dated October 29, 1885. Since that time the defendants have acquired other land, so that the bogs now consist of about twenty-seven and one half acres. Water to flood the bogs comes from the Little pond through a sluiceway and flows into a series of ditches. The northerly end (evidently of a sluiceway) empties into the Great pond, where there is a dam and screens to keep débris from entering. When the land was originally purchased, there was a natural stream that flowed from the Little pond into the Great pond at times during flood conditions or high water. This stream has since been dammed by the defendants at a point several hundred feet from the Little pond at the head of one of the bogs, and at some distance easterly from the stream a new sluiceway has been made through which the water is taken to the bogs. Between this dam and the Little pond there is a swamp. At certain seasons of the year, principally in

the winter and during periods of heavy frost, it is necessary to flood the bogs for the protection of the crop, and on these occasions the flashboards are removed from the dam. The water is held on the bogs in the winter until such time in the spring as it is advisable to drain them, when the flashboards are removed from the dam at the northerly end of the bogs. On one or two occasions the bogs have been flooded for a day or two in the month of July. They do not drain to such an extent that the ditches are left entirely dry, and other water finds its way into them from underground sources through springs and from higher levels. In its natural course, water from the Little pond finds its way into the Great pond, and if the bogs were not there, the Little pond would overflow through this natural stream during flood conditions or high water into the Great pond. While the water is being drained from the bogs, cranberries, leaves and vines accumulate in the ditches, but are mostly prevented from entering the Great pond by the screens that have been erected. Employees of the water department and of the defendants clean these screens. The bogs are operated in a clean and sanitary manner.

There are about one hundred houses along the shores of the Great pond, many of which are occupied throughout the year. Some of the privies, cesspools and sinks drain into the pond through the gravel. The land of the Pembroke poor farm is drained by a deep ditch that runs to the edge of the pond. The privies, overflowing cesspools, the drain from the poor farm, the trees and bushes along the shore, and the numerous houses are probable sources of pollution. The conditions around this pond are described as "very bad," and the analyses of all experts have shown a pollution. Statute 1903, c. 200, authorized the plaintiffs, with the consent and approval of the State board of health, to take, by purchase or otherwise, lands, rights of way and easements in the vicinity of the Great pond that were reasonably necessary for preserving the purity of the water supply, but no action has been taken under this statute to purchase and control the land and buildings on the Great pond.

The stream between the two ponds is a tributary of the Great pond at such times as the water in the Little pond is high enough to overflow into it. But this overflow seldom happens except during high water and flood conditions. There are many cottages and an amusement park on the shores of the Little pond, and, in times of high water, some parts of the cottages are in the water. All of these cottages have cesspools or privies, some of which are located near the pond, drain into it through the ground, and are a dangerous source of pollution. Bathing, boating and fishing have been allowed on the Little pond, except for short periods, since 1932, while the pond was overflowing. The plaintiffs have been advised by the department of public health to put a stop to boating and bathing, but nothing has been done about it except to stop bathing for a short period in 1938 while the pond was overflowing. No attempt has ever been made to remove the cesspool and privy conditions on this pond, the water of which is polluted and unsafe for domestic use.

There is a pollution of the waters of the Great pond "due to excessive marine growth, odor, color and the presence of bacterial growth known as B. coli." There is also pollution from B. coli in the Little pond. The master was unable to find that there was pollution from B. coli from the water in the bogs flowing into the Great pond, except that which came from the Little pond. The water from the bogs, as it enters the Great pond, is unsuitable for drinking purposes because of color, taste and odor. The taste and odor are due to microscopic organisms that abound in the Great pond as well as in the bogs, and the amount coming from the bogs is inconsequential. The master also found that the evidence did not warrant the finding that the continued discharge of water containing these organisms into the Great pond would, in any way, deteriorate the quality of the water. The discoloration of the water in the bogs due to the contact with leaves and twigs has no harmful effect on the water of the Great pond, and the evidence submitted did not warrant a finding, as the master stated, that the waters of the Great pond are impaired thereby. He was unable

to find whether the B. coli from the bogs originated there or in the Little pond. The color of the water, as it flows into the Great pond, disappears as it advances into the large body of water, and at the pumping station at the northerly end of the pond it is not objectionable and is well within the standard set for color of water for domestic use. The Great pond contains about one hundred thirteen acres.

The only exception to the report that has been argued is to the finding of the master that the waters of the Great pond are not impaired, the contention being that the master also found that the water, as it came from the bogs, was unfit for drinking purposes. What the master did find was that the water from the bogs, as it enters the Great pond, because of color, taste and odor, is "unsuitable" for drinking purposes. He then made findings as to the color, taste and odor that have already been related, and concluded that the evidence was insufficient to support the contention that the continued discharge of the water containing the organisms referred to would, in any way, deteriorate the quality of the water in the Great pond, and further found that the evidence did not warrant a finding that the waters of the Great pond were impaired thereby. The exception was rightly overruled. *Nelson* v. *Bailey*, 303 Mass. 522, 527.

The plaintiffs' motion to recommit the report was denied. Whether the report should be recommitted was discretionary with the judge. An examination of so much of this motion as has been argued fails to disclose that there was any abuse of discretion. *Epstein* v. *Epstein*, 287 Mass. 248, 254. *Krauss* v. *Kuechler*, 300 Mass. 346, 348–349.

The plaintiffs contend that upon the master's report they should have been granted affirmative relief. Under the authority of St. 1885, c. 206, the plaintiffs took possession of the Great pond including its inlets. They were authorized to take the waters of this pond and those that flow into or from it, or any part thereof. It is assumed that the plaintiffs were entitled to the water that came from the inlet in question. *Fay* v. *Proprietors of Salem & Danvers Aqueduct*, 9 Allen, 577. *Brookline* v. *Mackintosh*, 133 Mass. 215, 221, 225. *Martin* v. *Gleason*, 139 Mass. 183, 189. See

*Wamesit Power Co.* v. *Allen,* 120 Mass. 352. It is true that the bill of complaint alleges that the defendants have changed the course of the stream that flows from the Little pond to the Great pond, and that they have dammed the course as changed. But the plaintiffs' real complaint is that the interference by the defendants with the natural flow of the water has corrupted and impaired the quality of the water in the Great pond and rendered it injurious to health. It is also assumed that the plaintiffs were entitled to the natural flow of water, subject to such reasonable uses as the defendants and others might make of it. See *Dwight Printing Co.* v. *Boston,* 164 Mass. 247, 255. *Mason* v. *Whitney,* 193 Mass. 152, 158. The master stated that there was no evidence as to the extent or volume of flow from the Little pond, except during periods of high water or flood conditions, but we think it sufficiently appears that sooner or later what water escapes from the Little pond reaches the Great pond, except for some possible evaporation. The plaintiffs contend, however, not that they do not get all the water to which they are entitled, but that the interference with the natural flow of the stream and the release of the water after the bogs have been flooded are to their detriment. The detriment, however, that is complained of is that the quality of the water in the Great pond is seriously impaired. The findings of the master, however, do not support this contention. See *Dwight Printing Co.* v. *Boston,* 164 Mass. 247, 255; *New England Cotton Yarn Co.* v. *Laurel Lake Mills,* 190 Mass. 48, 52. Compare *Merrifield* v. *Lombard,* 13 Allen, 16.

The plaintiffs, since 1929, have chlorinated the water in the pumping station for the purpose of freeing it from possible pollution. The master reports that this method is not considered absolute protection, and at times when the chlorinating plant has been closed, at one time for a period of six months, there was no evidence of any harmful effects from the use of the water. When the bogs were emptied in the summer, there was a slight increase in the chlorine dosage, but when they were emptied in the fall, no increased dosage was required. The necessity for this increased dos-

age may well be found in the conditions that exist around and upon the Little pond, the water of which is polluted and unsafe for domestic use. From the facts found, it cannot be fairly charged to conditions created and maintained by the defendants.

The plaintiffs contend that the facts show a violation of G. L. (Ter. Ed.) c. 111, § 167, which provides: "No sewage, drainage, refuse or polluting matter, of such kind and amount as either by itself or in connection with other matter will corrupt or impair the quality of the water of any pond or stream used as a source of ice or water supply by a town, public institution or water company for domestic use, or render it injurious to health, and no human excrement, shall be discharged into any such stream or pond, or upon their banks if any filter basin so used is there situated, or into any feeders of such pond or stream within twenty miles above the point where such supply is taken." See § 169, and *Mayor of Cambridge* v. *Dean*, 300 Mass. 174. There are no findings that the defendants have violated these provisions, and there is no suggestion that they or their employees, in operating the bogs, have violated them. In fact, the finding is that the bogs are operated in a clean and sanitary manner.

But the plaintiffs contend that the findings of the master relative to the color, taste and odor of the water from the bogs require the conclusion that the provisions of said c. 111, § 167, were violated. It is true that the water from the bogs as it enters the Great pond is unsuitable for drinking purposes because of its color, taste and odor, and that some of the microscopic organisms that cause the taste and odor abound in the pond as well as in the bogs. But the amount of these organisms coming from the bogs is inconsequential. These organisms have been flowing from the Little pond and the bogs into the Great pond without any harmful effects for a great many years, and the master stated that there was insufficient evidence that they would in any way deteriorate the quality of the water in the Great pond. It was found categorically that the evidence did not warrant a finding that the water of the Great pond

was impaired by reason of the color of the water that came from the bogs. The provisions of said § 167 relate to matter "of such kind and amount as either by itself or in connection with other matter will corrupt or impair the quality of the water . . . or render it injurious to health." It is unnecessary to consider the full import of said § 167, for we are of opinion that the findings, taken in connection with the plaintiffs' complaint, do not require the issuance of an injunction. Compare *State* v. *Diamond Mills Paper Co.* 18 Dick. (N. J.) 111, 118–119.

The defendants direct attention to the provisions of G. L. (Ter. Ed.) c. 111, § 162, relative to the removal of the causes of pollution of water supplies, wherein it is also provided that the department of public health shall not prohibit the cultivation and use of the soil in the ordinary methods of agriculture, if no human excrement is used thereon.

*Decree affirmed with costs.*