JEFFREY D. CHOKEL vs. FIRST NATIONAL SUPERMARKETS, INC.

Suffolk. October 3, 1995. - January 8, 1996.

Present: LIACOS, C.J., ABRAMS, LYNCH, GREANEY, & FRIED, JJ.

*Corporation*, Merger, Stockholder, Valuation of stock. *Uniform Commercial Code*, Investment securities, Security interest. *Value. Interest.*

Where a stockholder fulfilled the requirements of G. L. c. 156B, § 86, and demonstrated continued ownership of certain corporate shares held in his behalf by a broker as pooled shares in a fungible mass in a depository clearinghouse, the stockholder was entitled to appraisal of those shares under the statute despite any intermediary book entries by his nominees and, in the circumstances, he was not required to prove his ownership of specific shares; moreover, where the corporation was on notice that the stockholder dissented from a proposed merger and was demanding appraisal, the purpose of c. 156B, to give notice of dissent, was satisfied. [636-641]

In an action for an appraisal of stock, a Superior Court judge properly within his discretion valued a dissenting stockholder's shares using the "Delaware block" method, and there was no error in his using a single year of projected earnings as a more reliable and less speculative indicator of future earnings than historical figures and in his using a price-earnings ratio comparable to other similar corporations. [641-645]

In a civil action there was no error or abuse of discretion in the judge's awarding the plaintiff prejudgment interest at the rate of twelve per cent per annum compounded annually to compensate the plaintiff for the ten year period he was unable to use his principal withheld by the defendant. [645-646]

CIVIL ACTION commenced in the Superior Court Department on February 4, 1986.

The case was heard by *John C. Cratsley*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Edward Kancler* of Ohio (*Joel Z. Eigerman* with him) for the defendant.

*Joseph L. Kociubes* (*Mark W. Batten* with him) for the plaintiff.

ABRAMS, J. The defendant, First National Supermarkets, Inc. (First National), appeals from the judgment in a stock appraisal action filed pursuant to G. L. c. 156B, §§ 86-98 (1994 ed.), in which the plaintiff, Jeffrey D. Chokel, dissatisfied with the price offered in the merger-leveraged buy-out of First National, sought appraisal of 16,997 shares. The judge appraised the value of Chokel's shares at $29.78 per share and awarded him prejudgment interest at the rate of twelve per cent per annum, compounded annually. First National appeals alleging that the trial judge erred: (1) in allowing Chokel's action to proceed; (2) in the valuation of Chokel's shares; and (3) in awarding prejudgment interest at a rate of twelve per cent per annum, compounded annually. First National filed an application for direct appellate review which we allowed. We affirm.

1. *Facts.* On June 6, 1985, the board of directors of First National (board) approved, subject to shareholder approval, management's offer to acquire First National for $24.25 per share[1] and issued a press release. Prior to the merger, First National stock was traded actively and listed on the National Association of Securities Dealers Automated Quotation system (NASDAQ) market. During the period from January, 1984, to August, 1985, the market price per share ranged from $7.75 to $23.75. On June 5, 1985, the day before First National's public announcement of the anticipated merger, the closing market price for First National's stock was $19.75 per share.

On August 12, 1985, First National mailed a ninety-three page proxy statement to all registered owners of stock as of

---

[1] This type of merger is termed a leveraged buy-out because management borrowed a large sum of money to buy-out the minority stockholders. Management anticipated that the funds necessary to repay the acquisition debt would be generated by the company's future profits and by sale of some of the company's assets.

the record date, August 8, 1985, announcing a September 12, 1985, shareholder meeting to vote on the merger. As of the record date, Chokel was beneficial owner of 28,000 shares of stock held in "street name."[2] Of these, 100 shares were held directly by Chokel's broker, Merrill Lynch Pierce Fenner & Smith Inc. (Merrill Lynch) and 16,897 were held for Chokel by Merrill Lynch through its nominee, the Philadelphia Depository Trust Company (Philadep).[3]

On review of the proxy material, Chokel decided to vote against the merger. Both Chokel and Merrill Lynch presented First National with letters objecting to the proposed merger on Chokel's behalf and stating their intention to demand separate payment for 28,000 shares registered in the name of Philadep but beneficially owned by Chokel. Chokel then sought and obtained a revocable proxy, dated August 27, 1985, from Merrill Lynch authorizing Chokel to vote 28,000 shares of stock registered in the name of Philadep.[4] He presented the proxy at the meeting and voted 28,000 Philadep shares against the merger. The proxy was not challenged.[5] Despite Chokel's dissent, the merger was approved by 90.4% of the outstanding stock.

---

[2]"Street name" refers to the form of nominee name brokers use to register securities they hold for customers. Nominees are individuals or partnerships in whose name a stock certificate is registered for the purpose of having the certificate readily deliverable at all times. Rhodes, Transfer of Stock (1985).

[3]These are the 16,997 shares that are the subject of this action. The other 11,003 shares were held by Merrill Lynch through two other nominees. They have been redeemed accidentally by Merrill Lynch and are not part of this action. Merrill Lynch has agreed to make Chokel whole for the difference in value between the redemption price and the appraisal value for those shares.

[4]Philadep itself did not submit proxies for any of the shares in its name. Instead, it allowed Merrill Lynch to authorize proxies for the shares it held for Merrill Lynch customers.

[5]First National allowed Chokel to vote the 28,000 Philadep shares despite that prior to the September 12, 1985, meeting, Merrill Lynch had issued three additional proxies pertaining to shares registered in the name of Philadep authorizing the board to vote 17,948 shares of stock — 17,236 for the merger, 700 against, and 12 shares abstaining. These proxies provided that any earlier proxies for the same shares were thereby revoked.

Chokel received notice on September 17, 1985, confirming that the merger became effective on September 13, 1985. By letter dated September 27, 1985, Chokel made demand on First National for the fair value of 28,000 shares, which he determined to be $40 per share. Merrill Lynch additionally made demand on behalf of Chokel on October 3, 1985.[6]

On learning of Chokel's intent to dissent in September, 1985, Merrill Lynch attempted physically to segregate 28,000 shares (Chokel shares). Merrill Lynch asked Philadep to segregate its shares and send them to Merrill Lynch. Philadep complied, releasing all shares it held for Merrill Lynch including the Chokel shares. It still held First National shares, including 16,897 of the shares in dispute, for other brokers. Merrill Lynch later sent the Chokel shares back to Philadep who forwarded them to AmeriTrust Co., First National's transfer agent, where they were redeemed.[7] Chokel had not authorized this redemption and was unaware until several years later that it had occurred.

Despite Merrill Lynch's knowledge of Chokel's dissent, Chokel received a form letter from Merrill Lynch, dated September 30, 1985, informing him that his shares would be redeemed at the merger price of $24.25. Chokel's statement for the period from August 31, 1985, through September 27, 1985, indicated that his shares had been redeemed for $679,000 in cash.[8] This transaction was later reversed by Merrill Lynch. Chokel's October statement represented that he still owned 28,000 shares of First National stock. Until 1991, Chokel's statements continued to evidence ownership of 28,000 shares of First National stock. In 1991, the parties

[6]The trial judge found Merrill Lynch's notice to be duplicative. We agree. "Notice by a stockholder, whether of legal or beneficial title, is sufficient to meet the statutory prerequisite." *Sarrouf* v. *New England Patriots Football Club, Inc.*, 397 Mass. 542, 552 (1986).

[7]It is unclear from the record whether Merrill Lynch mistakenly asked that these shares be redeemed or whether they were sent to AmeriTrust Co. to be certificated in Chokel's name and AmeriTrust mistakenly redeemed them. This disagreement is irrelevant for purposes of this appeal.

[8]The statement used the terms "Redeemed" and "Exchange Tender" to describe the accounting transactions effected on Merrill Lynch's books.

learned for the first time that Merrill Lynch actually only held 16,997 unredeemed shares of First National stock for the benefit of Chokel — 100 shares in Merrill Lynch's street name[9] and 16,897 registered to Philadep but held through Merrill Lynch.

2. *Chokel's statutory right to appraisal.* Chokel seeks appraisal of 16,997 shares of First National stock. In order for Chokel's shares to be eligible for appraisal, Chokel must have fulfilled the requirements of G. L. c. 156B, § 86 (1994 ed.). General Laws c. 156B, § 86, requires that "no stockholder shall have such right [to demand payment for his shares and an appraisal thereof] unless (1) he files with the corporation before the taking of the vote of the shareholders on such corporate action, written objection to the proposed action stating that he intends to demand payment for his shares if the action is taken and (2) his shares are not voted in favor of the proposed action." "[T]he statutory requirements are to be liberally construed for the protection of dissenting stockholders within the limits of orderly corporate procedures and consistent with the purpose of the requirements." *Tabbi* v. *Pollution Control Indus., Inc.*, 508 A.2d 867, 869 (Del. Ch. 1986), citing *Raab* v. *Villager Indus., Inc.*, 355 A.2d 888 (Del.), cert. denied sub nom. *Mitchell v. Villager Indus., Inc.*, 429 U.S. 853 (1976). See *Sarrouf* v. *New England Patriots Football Club, Inc.*, 397 Mass. 542, 552 (1986). *In re Fair Value of Shares of Bank of Ripley*, 184 W. Va. 96, 100 (1990) (dissenter's rights statutes are

---

[9]Although it appears that Merrill Lynch held these shares for the benefit of Chokel prior to the merger, they were not part of the "Chokel shares" segregated after Chokel's demand; nor were they part of the block of shares Chokel voted against the merger.

The parties treated the 100 shares as added to the 16,897 shares held by Philadep at trial and on appeal. We, therefore, shall treat the 100 shares the same way. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 n.25 (1991); *Kagan* v. *Levenson*, 334 Mass. 100, 106 (1956), quoting *Santa Maria* v. *Trotto*, 297 Mass. 442, 447 (1937) ("The theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review of the acts of the trial judge").

construed favorably toward the shareholder and given a reasonable construction rather than a rigid and technical one). It is not disputed that Chokel met the statutory requirements. What is disputed is whether the 16,997 shares now held by Merrill Lynch for Chokel's benefit are the same shares that Chokel voted against the merger.[10] The burden is on Chokel to show compliance with the statute. See G. L. c. 156B, § 86. See also *Tabbi* v. *Pollution Control Indus.*, *supra* at 869 ("the party seeking appraisal bears the burden of proving compliance with the requirements of [the appraisal statute]").

Chokel argues that he voted 28,000 shares held for his benefit through Merrill Lynch and registered to Philadep and now is indisputably the beneficial owner of 16,997 shares held for his benefit by Merrill Lynch. Chokel contends that this is sufficient to show continued ownership of 16,997 shares and to entitle him to appraisal thereof. He asserts that the shares were held in a fungible mass and therefore it is both unnecessary and impossible to determine whether the particular shares voted against the action are the same shares he now holds. The trial judge agreed, holding that "[f]or purposes of the present action this Court ignores whatever intermediary transactions may have occurred in the processing of the Chokel shares for which Merrill Lynch was responsible. What is determinative is that taking into account all the shares that had been redeemed, whether intentionally or inadvertently, Merrill Lynch finally held only 16,997 shares of [First National] for Mr. Chokel."

First National disagrees with the judge's ruling, arguing that the 16,997 shares for which Chokel claims appraisal are

---

[10]In the action below, First National claimed that Chokel did not validly vote any shares against the merger, contending that the subsequent proxies issued by Merrill Lynch were for the same shares and operated to revoke Chokel's earlier proxy. The trial judge did not reach the issue because First National did not challenge Chokel's proxy when he presented it at the September 12, 1985, special meeting of stockholders. Citing G. L. c. 156B, § 41 (1994 ed.), the judge ruled that Chokel's proxy was validly exercised. First National does not challenge this ruling on appeal.

not the same shares he voted against the action. First National relies on evidence of redemption of shares which Philadep segregated and sent to Merrill Lynch in preparation for Chokel's appraisal demand. First National contends that these are the "only shares that Chokel can claim to have owned on the date of the Merger [and that they] *were submitted for redemption* by his agent, Merrill [Lynch], and *were redeemed*" (emphasis in original).

Chokel does not dispute that 28,000 shares held by Philadep were redeemed. Rather he disputes whether these anonymous shares can be attributed to him. He claims that they cannot. He is not claiming an ownership interest in nor seeking appraisal of those shares. Cf. *Sornberger* v. *Chesapeake & Ohio Ry.*, 81 Md. App. 14 (1989) (plaintiff, on discovery of the erroneous tender by his broker, attempted to return the funds to the company and repudiate the surrender of shares; the company refused; the case was dismissed). Chokel is instead seeking appraisal of the 16,997 shares registered to Philadep and Merrill Lynch which Merrill Lynch currently holds for his benefit. It is undisputed that these shares were held by Philadep or Merrill Lynch prior to the merger and that they have not been redeemed. Cf. *Graves* v. *Pittsburgh Consolidation Coal Co.*, 355 Pa. 224 (1946) (registered owner of shares bought shares after merger then sold pre-merger shares; held, plaintiff cannot substitute shares bought after merger for those owned before). The issue, which is an issue of first impression in this Commonwealth, is whether shares held by a depository clearing house, such as Philadep, are fungible and as such, it is immaterial that some shares were segregated for a particular purpose (to be held by Merrill Lynch for appraisal) and later shares were substituted for that purpose.

The fungible mass theory is based on the premise that shares held in a depository clearing house, although owned by a number of brokerage firms throughout the country, are indistinguishable when held in street name by the clearing house. Purchases and sales are accomplished by book entries — physical movement of the stock certificates is not re-

quired. All the stock certificates are held in the name of a clearing house, such as Philadep, "as pooled shares in a fungible mass for the benefit of all [the clearing house's] members." *Kirkwood* v. *Taylor*, 590 F. Supp. 1375, 1379 (D. Minn. 1984), aff'd, 760 F.2d 272 (8th Cir. 1985).

The rights and benefits of shares that are part of a fungible mass are governed by art. 8 of the Uniform Commercial Code (U.C.C.), G. L. c. 106, § 8 (1994 ed.). Section 8-313 (1) of the U.C.C. provides that the "[t]ransfer of a security or a limited interest, including a security interest therein to a purchaser occurs only: . . . (*d*) at the time a financial intermediary, not a clearing corporation, sends him confirmation of the purchase and also by book entry or otherwise identifies as belonging to the purchaser: . . . (iii) a quantity of securities that constitute or are part of a fungible bulk of securities shown on the account of the financial intermediary on the books of another financial intermediary."[11] Section 8-313 (2) further provides: "The purchaser is the owner of a security held for him by the financial intermediary . . . . If a security so held is part of a fungible bulk, as in the circumstances specified in [§ 8-313(*a*) (*d*) (ii) & (iii)] the purchaser is the owner of a proportionate property interest in the fungible bulk." Chokel thus claims to be owner of a proportionate interest in the securities held as part of a fungible bulk by Philadep. He claims his proportionate interest is satisfied by the shares he now holds and offers for redemption at the appraisal value.

Article 8 endorses use of this fungible mass theory. See U.C.C. § 8-107 (1) ("[u]nless otherwise agreed and subject to any applicable law . . . , a person obligated to transfer securities may transfer any certificated security of the specified issue in bearer form or registered in the name of the transferee . . ."). Further support is found in the comment

---

[11]Section 8-313(4) defines "financial intermediary" as "a bank, broker, clearing corporation, or other person, or the nominee of any of them, which in the ordinary course of its business maintains security accounts for its customers and is acting in that capacity." Thus, both Merrill Lynch and Philadep are financial intermediaries.

to this section which provides that "[t]he rights and interests represented by securities of the same issue are 'fungible' ".[12] The Uniform Laws Comment to the Uniform Commercial Code § 8-313 (Law. Co-op. 1984) further notes that it is the prevalent practice of brokers to treat securities as fungible. It is also a goal of the Securities and Exchange Commission (SEC) to eliminate stock certificates altogether. See SEC Release No. 34-35038, 59 Fed. Reg. 63,652 (1994). See also 15 U.S.C. § 78 q-l(e) (1994) ("The Commission shall use its authority under this chapter to end the physical movement of securities certificates in connection with the settlement among brokers and dealers of transactions in securities consummated by means of the mails or any means or instrumentalities of interstate commerce").

Chokel has satisfied the requirements of the appraisal statute, G. L. c. 156B, §§ 86-98, by offering for appraisal 16,997 shares held for his benefit for which demand was made and which were voted against the merger. He is entitled to appraisal of these shares despite any intermediate book entries by his nominees. Accord *Alabama By-Prods. Corp. v. Cede & Co.*, 657 A.2d 254 (Del. 1995) (once shareholder perfects his right to appraisal, such right is not lost through inadvertent tender of shares for payment at merger price). We agree with Chokel that the fungible mass theory is applicable in this situation to protect his right to appraisal. Any internal segregation within Philadep did not alter the relationship between First National and the shareholder of record nor did it prejudice First National's rights in the appraisal action. "[I]n an appraisal proceeding the corporation is required to look only to the registered stockholder. The corporation ought not to be involved in possible differences between the registered and beneficial owner." *Abraham & Co. v. Olivetti*

---

[12]"Fungible" is defined in U.C.C. § 1-201 (17) "with respect to goods or securities [as meaning] goods or securities of which any unit is, by nature or usage of trade, the equivalent of any other like unit. Goods which are not fungible shall be deemed fungible for the purposes of this chapter to the extent that under a particular agreement or document unlike units are treated as equivalents."

*Underwood Corp.*, 42 Del. Ch. 95, 97 (1964), aff'd, 42 Del. Ch. 588 (1966).

We reject First National's contention that ownership of specific share certificates must be proven. The appraisal statute should be construed liberally in favor of the stockholder. See *Sarrouf* v. *New England Patriots Football Club, Inc.*, *supra* at 552. The proxy Chokel obtained to vote Philadep shares did not specifically identify shares by certificate number or otherwise. It is thus impossible to determine if a particular Philadep share was voted for or against the merger. The "Chokel shares" are not distinguishable from the unredeemed shares by looking to First National's record book. Cf. *Kirkwood* v. *Taylor*, 590 F. Supp. 1375 (D. Minn. 1984) (plaintiffs' shares could be distinguished from other shares held by clearing house by looking at the purchase date). They can only be distinguished by looking internally at Philadep's and Merrill Lynch's book entries. As First National was unaware of these entries until several years into the litigation, it was not prejudiced by them. See *In re Fair Value of Shares of Bank of Ripley*, 184 W. Va. 96, 100-102 (1990), and cases cited therein.

The purpose of G. L. c. 156B, § 86, is to give the company notice of dissent. See *Sarrouf* v. *New England Patriots Football Club, Inc.*, *supra* at 552 ("The purpose of the requirement of written notification is to give the corporation notice of possible dissenters"). First National was on notice that Chokel was dissenting from the proposed merger and demanding appraisal of the value of 16,997 Philadep shares. The 16,997 shares in which Chokel retains a beneficial interest are now being presented for appraisal.[13] The purpose of the statute was satisfied.

---

[13]Chokel's continued beneficial interest distinguishes this case from those cited by First National. Compare *Sarrouf* v. *New England Patriots Football Club, Inc.*, *supra* at 543 (plaintiff Ciccarelli redeemed his shares and therefore was no longer entitled to appraisal), and LeCompte *vs*. Oakbrook Consol., Inc., Del. Court of Chancery No. Civ. A. 8028 (1986) (plaintiff not entitled to appraisal because all but one share of the stock held by the depository trust company were redeemed).

The trial judge correctly ignored the internal machinations of Philadep and Merrill Lynch as they did not alter rights as between Chokel and First National.

3. *Fair market value of Chokel's shares as of September 11, 1985.* The statutory date for the valuation of Chokel's shares was September 11, 1985, the day before the shareholder vote to approve the merger. The trial judge used the "Delaware block" method for valuing Chokel's shares as of that date. The Delaware block method calls for a determination of the market value, earnings value, and net asset value of the stock, and then a weighing of each element of value to ascertain the fair value of the stock. See *Piemonte v. New Boston Garden Corp.*, 377 Mass. 719, 724 (1979). See also Note, Valuation of Dissenters' Stock under Appraisal Statutes, 79 Harv. L. Rev. 1453, 1456-1471 (1966). The Delaware block method is an appropriate but not mandated approach to valuing stocks in Massachusetts. *Piemonte v. New Boston Garden Corp., supra* at 723. See *Weinberger v. UOP, Inc.*, 457 A.2d 701, 712-713 (Del. 1983).

Valuation of a dissenting shareholder's stock is a question of fact within the discretion of the trial judge. *Sarrouf v. New England Patriots Football Club, Inc., supra* at 550 ("Valuation is a question of fact, and we will not disturb a judge's determination unless it is clearly erroneous"), citing *Leader v. Hycor, Inc.*, 395 Mass. 215, 223 (1985). See also Mass. R. Civ. P 52 (a), 365 Mass. 816 (1974); *New England Canteen Serv., Inc. v. Ashley*, 372 Mass. 671, 675 (1977) ("In deciding whether a judge's subsidiary finding of fact is clearly erroneous, it must be emphasized that it is the trial judge who, by virtue of his firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence. . . . Thus, a finding of fact by the trial judge will not be deemed 'clearly erroneous' unless the reviewing court on the entire evidence is left with the firm conviction that a mistake has been committed" [citation omitted]).

First National does not dispute the calculation of net asset value or market value or the weighing of the factors. It, how-

ever, argues that the judge erred in determining the earnings value of First National stock. First National contends that it was clearly erroneous for the trial judge to use projected fiscal year 1986 earnings and not consider historical earnings in computing the earnings of the company. First National further contends that it was error for the judge to use a price-earnings ratio of twenty.

Under the Delaware Block method, earnings value is computed based on the average earnings of the corporation for the most recent five years. Generally, historical earnings are used rather than projected future earnings because they are thought to be more reliable. See *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 218 (Del. 1975); *Application of Del. Racing Ass'n*, 42 Del. Ch. 406, 421 (1965). The average earnings is then multiplied by a price-earnings ratio selected by the appraiser. The price-earnings ratio reflects the prospective financial condition of the corporation and the risk factor inherent in the corporation and the industry. See *Piemonte, supra* at 727. It is usually selected by looking to the price-earnings ratios of comparable corporations.

In the instant case, the trial judge did not rely on five-year historical earnings in calculating the earnings value of First National because he determined them to be inaccurate as a gauge of future earnings.[14] The trial judge gave numerous reasons for this conclusion: He considered the unusually low figures for fiscal 1984 and 1985 to be a result of expenses incurred by the company in connection with its three-year

---

[14]The net income (loss) before extraordinary items figures for 1981 through 1985 are as follows (in millions of dollars):

| | |
|---|---|
| 1981 | 7.536 |
| 1982 | 5.070 |
| 1983 | 8.078 |
| 1984 | (10.806) |
| 1985 | 1.262 |

Net income before extraordinary items for the first twelve weeks of fiscal 1986 (twelve week period ending June 22, 1985) was $1.228 million — an annual rate of $5.321 million.

$100 million capital expansion program; fiscal 1986 income and future income was expected to be considerably higher than the 1984 and 1985 figures would indicate; the capital expansion program was over 90% complete by the end of fiscal 1985; the increases in earnings from the expansion were just starting to be seen; management projected in its proxy statement that income would rise to $17.1 million by fiscal 1990 — a 249% increase; and First National itself recognized that the future prospects were excellent. Based on this information, the trial judge determined that on September 11, 1985, historical earnings were not indicative of future earnings because the capital expansion program with a built-in lag time of from six months to two years had caused the stock market to undervalue First National's prospects. The trial judge, therefore, looked at management's own projections of future earnings and compared them with the Value Line Investment Survey projections.[15] Value Line projected that First National's fiscal year 1986 net income before extraordinary items would be $5.2 million. First National projected its own net income would be $4.9 million for fiscal 1986. The trial judge accepted management's figure of $4.9 million for fiscal 1986 both because of management's superior knowledge and because it was the most conservative number offered. Given the requirements of honesty imposed by the SEC, First National had no reason to artificially inflate this figure. 15 U.S.C. § 78n (e) (1988). Securities and Exchange Act of 1934, regulation 14A.

First National does not argue that the figure is inaccurate. Rather it argues that it was error to base the earnings value on one year of projected earnings. We conclude, however, that there was no abuse of discretion in using only the fiscal 1986 figures as they were more reliable and less speculative

---

[15]Value Line Investment Survey is an independent, weekly, investment advisory service registered with the SEC. From at least 1983, through August 30, 1985, Value Line issued comprehensive quarterly reports analyzing First National from an investor's viewpoint.

than the figures for fiscal years 1987 through 1990, and more indicative of future earnings than the historical figures.

First National's complaint of "double dipping" into the future is without merit. The trial judge was within his discretion to weigh future prospects heavily given the unique situation of First National in September, 1985. Historical earnings should only be used if they are a reliable indicator of future earnings.

First National also objects to the price-earnings ratio used by the trial judge.[16] The trial judge used a price-earnings ratio of twenty. We apply a very deferential standard to determining the correctness of this finding. "The appraiser's choice of a multiplier is largely discretionary and will be upheld if it is 'within the range of reason.' " *Piemonte* v. *New Boston Garden Corp.*, 377 Mass. 719, 727 (1979), and cases cited therein.

Value Line's report published on May 31, 1985, contained a price-earnings ratio for First National of 15.3 based on six months trailing and six months projected income. The average for the supermarket industry was 12.75. The trial judge, rather than relying on the average or on Value Line's figures, chose to compare First National with the four comparable companies with the highest percentage growth in five-year projected earnings. With a projected 249% growth in five-year projected earnings, First National would have ranked second. The comparable companies with available price-earnings ratios all had primary price-earnings ratios near twenty.[17] Under the Delaware block method as employed in Massachusetts, the trial judge is permitted but not obliged to look to the price-earnings ratios of other corporations. *Piemonte, supra* at 728.

---

[16]A common stock's price-earnings ratio is calculated by dividing its per share market price by the per share net income before extraordinary items. As discussed above, the income figures used in the calculation may be based on historical earnings, projected earning, or a combination of the two. The price-earnings ratio is also commonly called a multiplier.

[17]If the company recently had moved from negative earnings into positive, an accurate price-earnings ratio would not be available.

Given First National's projections and the price-earnings ratios of the most directly comparable companies, we believe the trial judge's choice of twenty as the price-earnings ratio to be "within the range of reason".

4. *Interest.* The award of prejudgment interest, like the choice of the price-earnings ratio, is within the discretion of the trial judge. *Sarrouf* v. *New England Patriots Football Club, Inc., supra* at 551. In determining the appropriate rate of interest, the judge should look to "the rate of interest at which a prudent investor could have invested money." *Piemonte* v. *New Boston Garden Corp.*, 377 Mass. 719, 735 (1979), citing *Universal City Studios, Inc.* v. *Francis I. duPont & Co.*, 334 A.2d 216, 222 (Del. 1975). Evidence was presented to the trial judge that AAA corporate bonds were yielding 11.13% in September, 1985, and paid interest semiannually, thus enabling a higher return than if interest was paid annually. Bond ratings are an approved basis for measuring the amount of interest to be awarded. *Piemonte* v. *New Boston Garden Corp., supra* at 735. The determining factor in interest computation is that the interest must compensate the "plaintiffs for the value of the use of the principal withheld from them." *Speed* v. *Transamerica Corp.*, 135 F. Supp. 176, 201 (D. Del. 1955), modified, 235 F.2d 369 (3d Cir. 1956). First National had the use of Chokel's money for a ten-year period and was able to invest or use that money interest-free. We conclude that there was no error and no abuse of discretion in awarding Chokel prejudgment interest at a rate of twelve percent per annum to compensate him for the inability to use his money for that ten-year period.

The decision whether to award compound interest is also within the discretion of the trial judge. The statute neither requires nor prohibits compound interest. *Sarrouf* v. *New England Patriots Football Club, Inc., supra* at 551. As appraisal is an equitable proceeding, the judge may, in his discretion, award compound interest. *Id.* See Grant, Appraisal Rights: Allowance for Prejudgment Interest, 17 B.C. Indus. & Com. L. Rev. 1, 19-20 (Nov. 1995) (compounding interest

is the only way to make the award of interest truly compensatory).

There was no abuse of discretion in the award of compound interest. We affirm the judgment of the trial judge. See also *BNE Mass. Corp.* v. *Sims*, 32 Mass. App. Ct. 190, 202 (1992) (decision to award prejudgment interest at the rate of twelve per cent per annum compounded annually was well within the scope of the trial judge's discretion).

*Judgment affirmed.*