Kane, Robert J., J.
In this consolidated proceeding involving disputes over the sale of a funeral business, suit was originally brought by Coutinho-Boisse Funeral Home, LLC (“Coutinho-Boisse”), Sean M. Coutinho, Shane B. Coutinho, Jon Coutinho (collectively referred to as the “Coutinhos”) and George H. Boisse (“Boisse”) against Hamel, Wickens & Troupe Funeral Home, Inc. (“HWT”) and Roger G. Hamel (“Hamel”). The complaint alleges defendants: (1) breached express contractual obligations; (2) breached the contract’s implied covenant of good faith and fair dealing; and (3) violated G.L.c. 93A, §11. Subsequently, HWT and Hamel brought suit against Coutinho-Boisse, the Coutinhos, and Boisse for breach of a promissory note and associated personal guarantees.
FINDINGS
Trial occurred over five days with five witnesses testifying and forty-three exhibits admitted. Based upon a review of the credibility of the documentary, photographic and testimonial evidence, this court now makes the following findings of fact and draws from the credible findings reasonable inferences.
Originally, HWT engaged in the funeral business as an unincorporated business operating under the name of Wickens & Troupe. Subsequently, the business became known as HWT which incorporated in 1968. Up until 1998, the business operated solely out of premises located in Quincy, Massachusetts.
BOARD OF REGISTRATION
The Board of Registration in Embalming and Funeral Directing (hereinafter referred to as “the Board”) regulates Massachusetts funeral businesses. As described in 239 CMR §3.01 (2002), the Board’s jurisdiction covers licensed funeral establishments. According to 239 CMR 3.01, a licensed funeral establishment constitutes:
*573 a fixed place or establishment owned or maintained by a person, partnership, corporation, association or other organization which has been duly registered by the Board pursuant to M.G.L.c. 112, §84 and which is located, constructed, equipped and operated for the purpose of providing sanitary handling, preparation, disposition and care of dead human bodies.
The regulations provide further detail on the definition of what constitutes the “Business of Embalming and Funeral Directing.” Under 239 CMR 3.01, such a business encompasses, inter alia:
(a) Consulting with members of the general public about, and/or making arrangements concerning the disposition of human remains, including arrangements for cremation for compensation; (b) Removing a human body from the place of death; (c) Transporting human remains; [and] (k) Making cemetery, cremation and/or anatomical gift arrangements at the request of the decedent or the decedent’s family (emphasis added).
As will be further described, the Board’s regulatory system is capacious, covering functional aspects of embalming and funeral directing and encompassing the structure and practices of a funeral business. Within 239 CMR3.00 stands Section 3.13, titled “Code of Conduct and Professional Ethics.” The Board’s code of conduct evidences a strong regulatory interest in having a funeral business operate under a single corporation. Under 239 CMR 3.13, the code of conduct provides:
No person who is registered with the Board, nor any person who holds an ownership interest in or is employed by any funeral establishment licensed by the Board, shall engage in, or hold any ownership interest in, any other business which is related to the disposition of human remains, including but not limited to any cemetery; crematorium; retail or wholesale casket or vault sales or rental enterprise; monument sales enterprise; or other similar business.
Further, 239 CMR 3.13(3) prohibits a person registered with the Board from “referring members of the general public to licensed funeral establishments in which he or she holds an ownership interest or is employed.”[1]
HWTS EXPANSION
In 1994 and in 1998, HWT expanded in two ways. First, it organized The Cremation Society, Inc. (“the Society”), dedicated to signing up individuals interested in having a loved one cremated. To enlist cremation customers, the Society through franchisees (funeral businesses) offered discounted rates that a customer, for a twenty-five dollar ($25.00) fee, could lock in while retaining the right to later choose another funeral business to handle the cremation.
The Society only brokered business to franchisees which provided the cremation services. Unattached to any physical property of its own, the Society occasionally used HWT’s business premises to conduct its business affairs, including advertising which was transacted in Cape Cod as well as in other areas of the state.
REGULATION OF “PRE-NEED FUNERAL CONTRACTS AND ARRANGEMENTS”
The Board specially regulates “Pre-need Funeral Contracts and Arrangements” (“pre-need funeral contract”). Under 239 Code Mass. Regs. §§4.01-4.10 (1998), the Board set out regulations for executing pre-need funeral contracts. A pre-need funeral contract is defined under 239 CMR 4.01 as “any pre-need funeral services contract or pre-need funeral arrangements contract, entered into in advance of death.” Under 239 CMR 4.03(l)(d), monies deposited as a prepayment for funeral services must be maintained within a funeral trust.
Under 239 CMR 4.02(8), “all pre-need centers or offices which engage in the preparation, negotiation or execution of pre-need funeral contracts or arrangements shall be located within a duly licensed funeral establishment.” Under 239 CMR 4.08(5), such a funeral establishment in advertising pre-need funeral products must disclose “the nature of the relationship between the agent who solicits the purchase of the product” and “the funeral establishment which is to provide the funeral goods and/or services.” Under 239 CMR 4.02, funeral establishments responsible for pre-need funeral contracts must maintain certain customer account information and under 239 CMR 4.06(6) (d), must:
send written notice of any transfer of ownership of the funeral establishment ... to the buyer (and beneficiary, if different) of every pre-need funeral contract to which it is a party, via certified mail, return receipt requested, not later than ten days after the effective date of said transfer or sale.
PURCHASE OF HARWICH FUNERAL BUSINESS
As previously stated, in 1998, HWT purchased the funeral business and premises originally operated by Eaton and Blute. Eaton and Blute had been succeeded by Doane, Beal, and Ames, which in turn had been succeeded by a conglomerate. For four years prior to HWTs purchase, the business had been closed. During its ownership that spanned four years, HWT gradually built up the business.
NEGOTIATION AND SALE OF HARWICH FUNERAL BUSINESS
In 2002, Hamel had been approached by Boisse about selling the Harwich business. Boisse had been a licensed funeral director for several years prior to approaching Hamel about buying the Harwich business. While in Massachusetts, he had worked at *574 Doane, Beal, and Ames, but by 2002 he was working full-time as an automobile salesman and only part-time as a funeral director. In 2002, Boisse had worked on occasion for HWT at its Harwich location. This employment led to his inquiry of Hamel about purchasing the business.
After Hamel expressed interest in selling the Har-wich business, Boisse successfully approached the Coutinhos about joining him in purchasing the Har-wich facility. Sean Coutinho, a funeral director apprentice, had worked as a dressman at the Harwich facility.
NEGOTIATIONS
Originally, Coutinho-Boisse wished to purchase both the business and the premises but Hamel wanted $500,000.00 for the business and the premises, a price unacceptable to Coutinho-Boisse. Nonetheless, negotiations continued, and on March 20, 2002, Hamel displayed a computer printout of 220 names representing individuals who had entered into pre-need funeral contracts with the Harwich facility.[2] The listing consisted of individuals who wanted traditional funeral services, individuals who wanted cremation services and one or more individuals who wanted both cremation and a funeral service at the Harwich facility.
Coutinho-Boisse integrated that printout of pre-need funeral arrangements into their business plan. Their business plan was presented to a number of conventional funding sources which rejected their request for financing. Eventually, they returned to Hamel who stated that he wanted a down payment and was willing to write a note for the remainder. With Hamel only willing to sell the premises and business for $500,000.00, Coutinho-Boisse now agreed to rent the premises under a twenty-year lease and to purchase the funeral business for a price of $250,000.00 with $40,000.00 to be paid as a down payment.
A purchase and sale agreement was drafted but never signed. The purchase and sale agreement contained a provision that in return for the sale price of $250,000.00, HWT agreed to provide, inter alia, “pre-made arrangements made for the location, [and] good will.” The purchase and sale agreement also contained a non-compete clause prohibiting HWT from “re-establish[ing] and/or reopen[ing] a business premise similar to the one hereby agreed to be sold within the area known as Cape Cod, Massachusetts for a period of five years from the date of this sale.”
On August 1, 2002, the parties met at the Law Offices of Thomas Williams, HWTs counsel. On that date, the parties executed the following documents: (1) a twenty-year commercial lease; (2) a promissory note for the payment of $210,000.00; (3) a bill of sale; (4) guarantees; and (5) a security agreement. About one month before the August 1st execution of the closing documents, Hamel notified Coutinho-Boisse that the closing was set for August 1, 2002. One week before the closing, Coutinho-Boisse, which had yet to receive the closing documents, met with Attorney Kenny. Not until August 1, while Coutinho-Boisse were driving up to Quincy, did Attorney Kenny receive drafts of the closing documents.
At the August 1 closing, Attorney Williams asked Coutinho-Boisse if they wished to postpone the closing due to the late transmission of the documents. Coutinho-Boisse, anxious to close the deal, said that they wished to proceed. Noticing that the bill of sale failed to contain a non-compete covenant found in the purchase and sale agreement, Coutinho-Boisse requested its insertion. Hamel agreed and the bill of sale was amended to contain the covenant not to compete found in the unsigned purchase and sale agreement.
Ultimately, the parties executed, as previously described, a bill of sale, a promissory note for $210,000.00, a twenty-year lease, a security agreement and personal guarantees. The bill of sale contained the following salient provisions: (1) while including the sale of good will, the bill of sale failed to include transfer of the name “Hamel, Wickens & Troupe Funeral Homes, Inc.”; (2) while the purchase and sale agreement referenced the transfer of pre-made arrangements, the bill of sale provided for the sale of assets including “a list of all pre-arranged funerals . . . attached ... as Exhibit B,” which contained twenty-six pre-arranged funerals with all but one of the pre-arranged funerals traditional funerals rather than a cremation;[3] (3) the agreement acknowledged that “The Cremation Society of Massachusetts is a separate corporation apart from the funeral home” and Coutinho-Boisse agreed to perform services “required for cremation at a price agreed by the parties”; and (4) the pre-paid arrangement funds were to be kept in a separate account and if buyers defaulted on the lease or promissory note, the account would be transferred back to seller. The promissory note was a negotiable instrument containing a six percent interest charge with the principal due on August 1, 2005. Between August 1, 2002 and August 1, 2005, buyers would only be responsible for paying interest.
The twenty-year lease agreement contained provisions favoring the lessor including: (1) improvements to the premises could be undertaken by the lessee at its cost with alterations, additions and improvements becoming part of the demised premises and the sole property of lessor; (2) the lessee would be responsible for all repairs, replacements and maintenance; and (3) failure to perform any of the conditions set forth in the lease continually for a period of thirty days after notice by lessor would constitute a default and lessor would have the right to terminate the lease by providing fourteen days notice of cancellation and termination.
POST-SALE CONDUCT
As required by the Board, the parties submitted their agreement to the Board for approval. The Board instructed the parties that the clause regarding pre-need arrangements must be excluded from the agree *575 ment; the parties complied with the Board’s instruction.
Because Coutinho-Boisse did not then possess an establishment license issued from the Board, HWT allowed Coutinho-Boisse to operate under its license for two to three months. During that period of time, Hamel performed funerals for Coutinho-Boisse.
THE CREMATION SOCIETY, INC.’S CAPE COD MARKETING
Meanwhile, Hamel, while still operating out of his Harwich residence, marketed the services of the Society. Using Verizon’s Superpages and Yellowpages, Hamel advertised the Society’s services.
NOTIFICATION TO PRE-ARRANGEMENT SERVICES CUSTOMERS
HWT failed to comply with 239 CMR 4.06(6) requiring notice of the Harwich funeral establishment’s transfer of ownership to Coutinho-Boisse. In failing to so notify, HWT adopted the position that the sale of its Harwich facility did not involve a sale of the Society’s “cremation services.” In a letter to an individual who had entered into a pre-need funeral contract for cremation services, Scott Hamel, the 40% owner and operating officer of the Quincy based HWT, wrote:
Since we still own The Cremation Society of Massachusetts business, under Massachusetts law we are not required to inform anyone seeing we did not sell our business. If you had a traditional funeral set up with Hamel, Wickens & Troupe, we did notify those people. Since this was a cremation, we didn’t have to inform people.
Shortly after the sale, Coutinho-Boisse asked Hamel to provide them with names and addresses of all individuals who had entered into pre-need funeral contracts through the Harwich funeral home. Hamel refused to do so. Hamel did not notify any of the individuals on the March 20, 2002 list who had pre-need contracts for cremations only of the transfer of the Harwich funeral establishment to Coutinho-Boisse.
Within a few months after opening for business, Coutinho-Boisse began receiving calls from individuals who had executed pre-need funeral contracts with HWT, including families of recently deceased individuals who were learning for the first time that the business had been transferred and that HWT was no longer doing business on Cape Cod. None of these individuals had been notified by HWT of the transfer but had learned about it through seeing advertisements in the newspaper or when they called the funeral home to make arrangements for a family member and then learned that the funeral business at the Harwich facility had been transferred. Coutinho-Boisse would then request customer account information from HWT which refused to provide the information. Only upon receiving a request from a customer of a pre-need funeral contract agreement would HWT transfer the information to Coutinho-Boisse.
One of the individuals who hadn’t been notified was a Susan McLean, whose mother had a pre-need arrangement with HWT out of the Harwich location. She brought a complaint to the Board. After holding a hearing the Board determined that Hamel had violated 239 CMR 4.06(6). As a result of these violations, the Board suspended Hamel’s funeral director’s license for two years.
LOSS OF PRE-NEED FUNERAL CONTRACTS
In 2002, a cremation service cost far less than a traditional funeral service. At that time, a cremation cost $695.00 compared to a price range of between $4,000.00 to $6,000.00 for a traditional funeral. The profit margin on a cremation service amounted to $200.00.
Of the 220 names on the computer printout, forty of those individuals had died prior to August 1, 2002. From August 1, 2002 through December 31, 2002, Coutinho-Boisse received calls from between thirty to fifty different families inquiring about their pre-need arrangements. From January 2003 through November 2003, Coutinho-Boisse received calls from an additional seventy-five to 100 different families inquiring about their pre-need arrangements. Over 90% of the calls came from individuals with pre-need cremation contracts. Coutinho-Boisse advised the families numbering between 105 to 150 that they were the new owners and advised them of their options. Some of these families switched their pre-need arrangements to Coutinho-Boisse while others did not. During this period of August 1, 2002 through 2006, the total number of bodies removed from Cape Cod for HWT totaled 99. Of the 99 removed bodies 91 were taken to crematoriums and 8 were taken to cemeteries.[4] Three of the removed bodies were Hamel’s relatives.
RULINGS
HWT claims that Coutinho-Boisse breached the promissoiy note by failing to pay the principal on time. While the promissoiy note, a negotiable instrument subject to the Uniform Commercial Code, failed to incorporate the bill of sale, G.L.c. 106, §3-305 provides Coutinho-Boisse with the defense that HWT failed to perform what it had promised in the bill of sale.
SALE OF GOOD WILL
“(G)oodwill is, fundamentally, the value of an enterprise over and above the value of its net tangible assets . . .” Donahue v. Draper, 22 Mass.App.Ct. 30, 35 (1986). Its value comprises the aggregated worth of the business’s longevity, location and “distinctive name.” Moore v. Rawson, 185 Mass. 264, 273 (1904). Additionally, “good will covers a right to continue . . . jobs in various stages, as to which the firm had already been consulted . . .” Rutan v. Coolidge, 241 Mass. 584, 597 (1922). The August 1,2002, bill of sale transferred *576 good will to Coutinho-Boisse and the transfer of good will included Coutinho-Boisse’s interests in the pre-need funeral contracts that HWT, through its Harwich office, had established but never implemented prior to the August 1, 2002 sale. Such good will encompassed customer account information that HWT had to maintain pursuant to 239 CMR 4.02(5).
Both the contract’s transfer to Coutinho-Boisse of good will and the Board’s regulations on the duly to notify pre-need customers of a funeral business’s transfer of ownership precluded HWT from limiting or interfering with Coutinho-Boisse’s interests in the pre-need funeral contracts. Under the Board’s regulations, HWT had to notify the pre-need customers that the business had been transferred from HWT to Coutinho-Boisse, leaving the customer free to continue with HWT in its Quincy office or to make arrangements with Coutinho-Boisse located in Harwich. As a licensed funeral establishment, HWT violated the Board’s regulations when it failed to notify the holders of pre-need funeral contracts of Coutinho-Boisse’s purchase of HWT’s Harwich location. HWT also breached the contract’s good will provision by refusing to share pre-need customer account information with Coutinho-Boisse.
Additionally, any argument that the bill of sale eliminated Coutinho-Boisse’s interests in the pre-need contracts by conferring those interests exclusively to the Society fails as a matter of law. The Society’s generation of pre-need funeral contracts for cremations had contravened the Board’s regulations requiring that the marketing of pre-need funeral contracts occur under HWT. By operating as a secondary business involved in activities coming under the definition of a licensed funeral establishment, the Society had acted contrary to law. Therefore any references in the bill of sale to direct or indirect benefits to the Society are null and void. Arcidi v. National Ass’n of Gov’t Employees, Inc., 447 Mass. 616 (2006). Excising from the bill of sale benefits to the Society does not render the bill of sale as a whole null and void. See In re 604 Columbus Ave. Realty Trust v. Capital Bank & Trust Co., 119 B.R. 350, 372 (Bankr.D.Mass. 1990) (“In Massachusetts, the illegality of one portion of an otherwise legal agreement does not necessarily render the entire agreement unenforceable”). The excision only nullifies contractual language directly or indirectly conferring benefits to the Society.
BREACH OF CONTRACT
HWT interfered with Coutinho-Boisse’s rights to good will under the contract and violated the Board’s regulations governing the conduct of licensed funeral establishments. Under the contract’s transfer of good will and under the Board’s regulations, HWT was duty bound to notify holders of pre-need funeral arrangements of the transfer of ownership of the Harwich funeral establishment to Coutinho-Boisse. By failing to do so, HWT violated the express terms of the bill of sale regarding the transfer of good will to Coutinho-Boisse and violated the Board’s regulations which constituted implied terms of an agreement to sell a funeral business. See Mayor of Salem v. Warner AMEX Cable Comm., Inc., 392 Mass. 663, 666 (1984). Additionally, HWT breached the good will provision by refusing to turn over pre-need client account information to Coutinho-Boisse.
REMEDY FOR BREACH
The remaining question asks what effect HWT’s breach has upon the enforceability of the promissory note. “It is well established that a material breach by one party excuses the other party from further performance under the contract.” Ward v. American Mut. Liab. Ins. Co., 15 Mass.App.Ct. 98, 100 (1983). “A party who first commits a material breach cannot enforce the contract.” 23 S. Williston, Contracts §63.3 at 443 (4th ed. 2002); See Michael J. Shiels, Inc. v. Buchnan, 69 Mass.App.Ct. 1105 (2007) (“[I]t is critical to determine which party first committed a material breach” to determine if a party is excused from performance).
A material breach is defined as a breach of “an essential and inducing feature of the contract.” Prozinski v. Northeast Real Estate Services, LLC, 59 Mass.App.Ct. 599, 608 (2003). Otherwise stated, a breach “so serious and so intimately connected with the substance of the contract! 1 as to justify the [other party] in refusing ... to be bound further . . .” Bucholz v. Green Bros. Co., 272 Mass 49, 52 (1930). The existence of a material breach is to be determined by the trier of fact upon review of the circumstances of each case. Prozinski, 59 Mass.App.Ct. at 609. Determining the existence of materiality in a particular fact pattern requires examination of the parties’ negotiations, the agreement’s terms, and the parties’ subsequent conduct for the purpose of determining whether the breach concerned an essential and inducing feature of the agreement. In addition, the court considers “the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived, the extent to which the party failing to perform or to offer to perform will suffer forfeiture, the likelihood that the parly failing to perform or to offer to perform will cure his failure and the extent to which the behavior of the party failing to perform or to offer to perform comports with the standard of good faith and fair dealing.” O'Connell Mgt. Co., Inc. v. Carlyle-XIII Managers, Inc., 765 F.Sup. 779, 783 (D.Mass. 1991); Restatement (Second) of Contracts §241 (1979).
Turning to the instant case, under the bill of sale HWT transferred to Coutinho-Boisse, in return for $250,000.00, furniture, equipment, and good will. Good will was explicitly described as not including the name “HWT.” Good will thus only included the funeral business’s longevity at its present location and the *577 pre-need funeral contracts which had been displayed by Hamel to Coutinho-Boisse during the negotiation for the sale. In making out its business plan, Coutinho-Boisse relied on that computer printout of 220 pre-need funeral contracts in determining that it could meet rental and promissory note payments totaling over $4,500.00 on a monthly basis.
The pre-need funeral contracts, however, possessed an uncertain value. While the price of the cremation service was fixed, the date when the service would be provided was unknown. Additionally, it was unknown whether the parties to the pre-need funeral contracts would, upon notice of the sale, continue their pre-need funeral contracts with Coutinho-Boisse. The profit margin for a cremation service only amounted to $200.00. Assuming that 90% of the 154 [5] pre-need cremation customers remained with Coutinho-Boisse and that 75% of the agreements were actually executed prior to August 1, 2005 when the $210,000.00 became payable, Coutinho-Boisse’s pretax profits would amount to under $25,000.00.
Hamel contends that Coutinho-Boisse’s failure to object to the listing of only twenty-six names within the bill of sale evidences the pre-need funeral contract’s lack of materiality. However, the bill of sale executed on August 1, 2002 was executed at HWT’s lawyer’s office with little opportunity to previously inspect the five sets of documents that Coutinho-Boisse were expected to sign. Therefore, this court fails to place great weight upon Coutinho-Boisse’s failure to object to the listing of twenty-six names in assessing the materiality of the pre-need funeral contracts.
Hamel also contends that Coutinho-Boisse’s failure to formally, by correspondence, object to HWT’s refusal to turn over pre-need client account information signifies the pre-need funeral contracts’ lack of materiality. This court disagrees, recognizing that the relationship of the parties must be understood in the context of Hamel acting as the landlord of Coutinho-Boisse’s premises and that such a relationship would naturally chill aggressive complaints. Furthermore, Coutinho-Boisse made timely oral requests for information regarding the pre-need funeral contracts.
Furthermore, this court, in its assessment of the materiality of the pre-need funeral contracts, finds HWTs and Hamel’s conduct violative of the covenant of good faith and fair dealing. As a licensed funeral establishment, HWT bore a duty under the Board’s regulations to provide notice to the pre-need funeral contract customers of the transfer of the business. By failing to do so and by refusing to directly accede to Coutinho-Boisse’s requests for client account information on pre-need funeral contracts, HWT unfairly and unlawfully interfered with Coutinho-Boisse’s ability to generate sufficient income to meet the terms of the promissory note.
Determining that HWTs breach constitutes a material breach will result in a considerable forfeiture. It will eliminate Coutinho-Boisse’s duty to pay $210,000.00 in principal. On the other hand, the remedy of monetary damages can compensate Coutinho-Boisse for lost profits. Moreover, the violation of the covenant of good faith and fair dealing constitutes a basis for relief under G.L.c. 93A.
Based on an examination of all the relevant factors this court fails to find a material breach. This ruling relies inter alia on: (1) the uncertainty attaching to Coutinho-Boisse’s potential for generating income from the pre-need funeral contracts; (2) the incidence of a considerable forfeiture; and (3) the availability of damages and other relief as remedies for HWTs violations.
DAMAGES FOR BREACH
“Under our well established rules of damages, the amount of damages need not be proved with mathematical precision; the extent of damages often must be left to estimate and judgment.” Our Lady of the Sea Corp. v. Borges, 40 Mass.App.Ct. 484, 488 (1996). “In cases arising from the defendant’s consciously wrongful conduct, an element of uncertainty in the calculation of damages is especially permissible.” Quinton v. Gavin, 64 Mass.App.Ct. 792, 800 (2005).
Recently, the Supreme Judicial Court addressed the calculation of damages in the context of lost profits. In Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 413 (2003), the court stated
“Prospective profits may be recovered in an appropriate action when the loss of them appears to have been the direct result of the wrong complained of and when they are capable of proof to a reasonable degree of certainty.” Lost profits are notoriously difficult to prove with precision. “The plaintiff [is] not required to prove its lost profits with mathematical precision. Under our cases, an element of uncertainty is permitted in calculating damages and an award of damages can stand on less than substantial evidence. This is particularly the case in business torts, where the critical focus is on the wrongfulness of the defendant’s conduct.”
Here, HWT’s intentional wrongful conduct interfered with Coutinho-Boisse’s potential to have the pre-need funeral contract customers choose to select Coutinho-Boisse to handle the burial. The assessment of damages for such a breach cannot rest on direct evidence because Coutinho-Boisse failed to bring forth customers of the pre-need funeral contracts to testify on why they maintained their arrangement with HWT rather than choosing Coutinho-Boisse to handle the service.[6]
Analysis of circumstantial evidence entails the determination of how many pre-need funeral arrangements occurred during this period and determining *578 whether Coutinho-Boisse would have secured those funeral contracts absent HWTs wrongful conduct. From August 1, 2002, HWT removed ninety-nine dead bodies from the Cape. Ninety-one were delivered to crematoriums and eight to cemeteries. If we subtract from the ninety-one those who were relatives of Hamel, eighty-eight may have been part of the pre-need funeral contracts for cremations executed by HWT prior to August 1, 2002.
Given the fact that HWT had ceased operating out of its Harwich facility as of August 1, 2002, it is likely that the eighty-eight arose from pre-need funeral contracts executed prior to August 1, 2002. The question remains whether, but for HWTs wrongful conduct, would Coutinho-Boisse have secured those pre-need customers. No evidence establishes that a personal bond existed between the pre-need funeral contract customers and Hamel or HWT. Rather, the attachment of the pre-need funeral contract customers to the contacts entered into with HWTs Harwich facility logically related to the Harwich facility’s location on Cape Cod. Therefore, this court adopts as reasonable the inference that a high percentage of those customers would have elected to maintain a relationship with the Harwich facility operated by Coutinho-Boisse.
The evidence reveals that a cremation’s profit margin amounted to $200.00. While a funeral service’s profit margin would logically equal $200.00, any further measurement of a funeral service’s profit margin constitutes guesswork.
Accordingly, this court determines that the evidence provides an adequate basis for the conclusion that at least 90% of the pre-need funeral contract customers would have elected to have Coutinho-Boisse handle the funeral arrangements. Ninety percent of the eighty-eight potential customers amounts to a lost profit of $15,800.00 ($200.00 x 79 lost customers).
VIOLATION OF 93A
General Laws Chapter 93A is broad in scope and does not catalog the type of conduct falling within its prohibition; instead, it references the interpretations of unfair acts and practices contained in Section 5 of the Federal Trade Commission Act, 15 U.S.C. §45(a)(l); see G.L.c. 93A, §2(a); Cummings v. HPG Intern, Inc., 244 F.3d 16, 25 (1st Cir. 2001). An act is unfair or deceptive for purposes of G.L.c. 93A if it is “within at least the penumbra of some common-law, statutory, or other established concept of unfairness ... or immoral, unethical, oppressive or unscrupulous . . . [and] whether it causes substantial injury to . . . (other businessmen).” PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975); see Massachusetts Employers’ Ins. Exch. v. ProPac-Mass., Inc., 420 Mass. 39, 42-43 (1995) (“[W]e focus on the nature of the challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L.c. 93A fairness determination”) .
Here, this court has found that HWT consciously violated the covenant of good faith and fair dealing. The covenant of good faith and fair dealing protects contractual parties from being deprived of the benefit of the bargain. Consequently, the covenant provides substantial protection to businessmen in their dealings with other businessmen. In sum, this court determines that the breach of the covenant of good faith and fair dealing constitutes a violation of G.L.c. 93A, §11.
This court further determines that the violation of G.L.c. 93A was intentional.
GENERAL LAWS 93A DAMAGES
This court determines that the damages deriving from the G.L.c. 93A violation amounts to $15,800.00, which this court, on the basis of the egregious quality of the violation, trebles amounting to a total damage award of $47,400.00. After receipt of a request for attorneys fees and any opposition, this court will determine reasonable attorneys fees and costs to be awarded under the G.L.c. 93A claim.
BREACH OF PROMISSORY NOTE
By failing to pay the balance due on August 1, 2005, Coutinho-Boisse breached the terms of the note. The breach entitles HWT to damages and other relief including reasonable attorneys fees and expenses incurred in enforcing the note.
ORDER
Each side shall submit a proposed judgment including awards of attorney fees in conformance with the above-mentioned rulings.

Section 3.15, titled “Advisoxy Ruling,” provides a person regulated by the Board with an opportunity to seek an advisory ruling with respect to the application of a regulation.

Hamel has denied displaying this pnntout to Coutinho-Boisse on March 20, 2002. His statement denying displaying that printout on that date is false. This finding comes from an overall assessment of his inconsistent testimony regarding his denial of displaying this printout on March 20, 2002.

The cremation included in the agreement may have included a funeral service at the Harwich premises.

The subpoenaed removal records covered bodies removed on or before August 1, 2002.

The 154 pre-need contracts represents the 220 pre-need contracts less the 40 individuals who had expired and the 26 pre-need contracts listed in Exhibit E to the bill of sale.

The absence of direct evidence is understandable. Imposing upon those individuals the emotional ordeal of retrieving information on why they maintained their relationship with HWT to handle the burial services would be an unwholesome practice. Such a course of action would also run the risk of antagonizing the potential witnesses.